**Filed: April 26, 2012**

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Plaintiff-Appellant,
Cross-Respondent,

v.

KEVIN JAMES JARNAGIN,

Defendant-Respondent,
Cross-Appellant.

(CC CR100378; SC S059521)

En Banc

On appeal from an order of the Yamhill County Circuit Court under ORS 138.060(2).

Argued and submitted January 13, 2012.

Leigh A. Salmon, Assistant Attorney General, Salem, argued the cause and filed the briefs for plaintiff-appellant/cross-respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Jedediah Peterson, Deputy Public Defender, Salem, argued the cause and filed the brief for defendant-respondent/cross-appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

KISTLER, J.

The order of the circuit court is affirmed in part and reversed in part.

De Muniz, C. J., concurred and filed an opinion.

KISTLER, J.

The state appeals and defendant cross-appeals from a pretrial order in a murder case suppressing evidence. *See* ORS 138.060(2) (authorizing an appeal directly to this court from certain pretrial orders in murder cases); ORS 138.040 (authorizing cross-appeals). On appeal, neither party challenges the trial court's ruling that the officers violated defendant's rights under the state constitution when they questioned him at the police station and later at a hospital without advising him of his *Miranda* rights. The parties focus instead on whether statements that defendant made the next day at his home and before and after a polygraph examination should be suppressed on the ground that those statements were a product of the *Miranda* violations the day before. For the reasons explained below, we hold that the statements defendant made at his home were a product of the *Miranda* violations the day before but that the statements he made before and after the polygraph examination were not. We accordingly affirm the the trial court's order in part and reverse it in part.

Defendant shared a home in Newberg with his girlfriend Kari and her two children, an eight-year-old son and an eight-month-old daughter Aleeha. On July 7, 2009, defendant was watching both children while Kari was at work. Around 9:30 in the morning, Aleeha appeared to be having a seizure. Defendant called Kari and then 9-1-1. A city police officer responded to defendant's call and arrived shortly after Kari had returned home. When the officer entered defendant's home, she noticed that Aleeha "was blue, her lips [were] gray, and her feet were light blue. And she also had a foam in her mouth and nose area." She did not appear to be breathing, and the officer performed

1

CPR to revive her. Emergency medical personnel and other law enforcement officers soon arrived.

An ambulance took Aleeha to a local hospital, and Kari rode with her. Defendant and the son went to the hospital but came back home around 11:00 a.m. When defendant returned home, some of the officers were still there. One of them, Detective Ronning, spoke to defendant in the driveway of his home. Ronning told defendant that they were investigating what had happened and asked if he would sign a consent form to permit them to look through the house. Defendant agreed. The detective also asked if defendant would be willing to talk to them. Defendant explained that he was on his way to Doernbecher Hospital in Portland, where Aleeha had been transferred. He said, "That's where I would like to go, but I would like to get this done so I don't get called away later." The detective explained that he would like to talk to defendant at the Newberg Police Station so that they could record their conversation.

At the station, the detective took defendant to an interview room in a secure part of the station. Ronning explained to defendant that he wanted to identify the sequence of events that had led up to Aleeha's seizure. Ronning then added, "One thing I want to make very clear, okay * * * you're absolutely * * * you're not under arrest." Defendant, for his part, confirmed twice that he was there voluntarily. When asked whether "you know [that] you can leave at any time," defendant answered, "Yes."

Ronning spoke with defendant at the police station for approximately two hours and 15 minutes. In the trial court's view, their conversation divided into two parts. During the first part, Ronning asked and defendant explained what he had done the night

2

before Aleeha suffered any injuries and what had happened that morning. Defendant told Ronning that he woke up, changed Aleeha's diaper, gave her a bath, and then put her on the bed while he went to get another diaper, which was a few feet away. Defendant said that, when he turned back to Aleeha, her arms were "spread out," her eyes were halfway open, and it "looked like her eyes were rolling into the back of her head." Defendant did not identify any event that would have caused the baby to experience those symptoms but said that, as soon as he saw the symptoms, he called Kari and then 9-1-1. During the first part of their conversation, the officer asked defendant, sometimes more than once, to go over everything that had happened, how long he spoke to Kari, what he did with the baby while he was calling Kari and 9-1-1, and what Kari had done once she arrived.

The second part of their conversation, according to the trial court, began when the detective said, "there's some things that aren't making sense to me, and we need -- need to go over this." The detective reminded defendant that "you're not under arrest," and he added, "I'm not looking to make a bad guy out of anybody here." He assured defendant that "what happened to this baby wasn't something that anybody intended to happen," but he explained that "what happened to this baby couldn't have happened if everything is exactly like you told me." The detective added that defendant may not know what had happened to Aleeha, but he was concerned that defendant was "leaving something out because you weren't in the room, or you were in the room, or --."

At that point, defendant said that he had failed to mention that Aleeha had fallen over in the bathtub. Defendant then told the detective additional details regarding Aleeha's injuries. Initially, he said that Aleeha accidentally fell over in the bathtub with

3

her mouth under the spigot. When the detective asked whether a baby could have gotten water in her lungs that way, defendant added that Aleeha had hit her head on the side of the tub, had tipped over, and gone under the water. During their discussion, the detective repeatedly held out the possibility that Aleeha's injuries could have occurred accidentally; he did not accuse defendant of intentionally harming her.

Detective Ronning left the room to make a telephone call and his supervisor, Lieutenant Kosmicki, came into the room. After asking defendant a few questions, the lieutenant told defendant, "I can tell there's something you want to get off your chest." When defendant said, "I just want to get to Portland," the lieutenant replied, "I understand that, but -- I can tell there's also something that you want to get off your chest. There's no doubt in my mind." After explaining that he had listened to Detective Ronning's interview with defendant and spoken to Aleeha's doctors, the lieutenant said, "Now, I don't think you're a bad guy, but something else happened."

When defendant essentially repeated what he had told Detective Ronning, the lieutenant asked whether defendant might have left Aleeha alone in the bath. Then he added:

> "You're not under arrest now. You're not going to be under arrest now if you're telling the truth. Okay? And I'm not keeping you here until you tell me something so you can be under arrest, that's not the deal. I'm trying to give you every opportunity to tell me if you were out of the room for longer than you're telling me. 'Cause the evidence is going to show it sooner or later. And maybe you can roll the dice and say, 'Gee, maybe the baby will be okay.'
>
> "That baby is a really sick baby now. Had no brain activity for a long time. There's a lot of other issues wrong with [her]. And if something goes wrong, you want to be the first one to say, 'I told them everything I

4

knew and it was an accident.'"

Despite that admonition, defendant did not tell the officers any different information about what had happened. At 1:55 p.m., defendant left the police station and went to Doernbecher Hospital in Portland to be with Kari and Aleeha.

Approximately six hours later, Detectives Ronning and Baltzell spoke with defendant and Kari in a private room at Doernbecher Hospital. Detective Ronning started by telling them:

"[W]e've got an eight-month-old baby, that's got healing rib fractures, pubic bone and current * * * skull fractures that happened today, which probably caused the cardiac arrest that caused that seizure today. And a split liver, and a bruised spleen, and some issues in the bathtub.

"I have spoken with both of you guys and you're the only ones who watched the kids. You're the only one that's home today. I want to know how those injuries happened to those kids. And so you're both in this room because you both said nobody else watches the kid but me. So you can sit here and tell me, 'Gee, I don't know.' An eight-month-old baby girl that's in there that you guys are responsible for.

"* * * And you both sat there and lied to my face, and one of you probably more than the other, about, 'I don't know what happened.' What happened?"

When defendant said that he already had told the officers what happened, Ronning asked whether defendant would take a polygraph, and defendant said, "I would." Ronning asked a second time and defendant replied, "Yeah." Detective Baltzell then joined in the conversation. He explained that there was "a big difference" between accidentally causing the injuries and intentionally doing so. When he suggested that defendant might have gotten "tired [or] frustrated" with the baby, defendant said that he might have inadvertently hugged the baby too hard.

5

At that point, Kari left to speak with a nurse. Baltzell explained that, for the most part, he had dealt with "normal people [and] that just -- something happens," to which defendant added, "And they make mistakes." Baltzell affirmed that "everybody makes mistakes," and then he told defendant, "I just need to know what happened today." After explaining that he did not "like talking about these things around Kari," defendant told the officers that he had been holding Aleeha with one arm while he was trying to pour some cereal into a bowl. She struggled, slipped from his grasp, hit her head on the corner of the kitchen cabinet, and then hit the floor. She would not stop crying so "[he] took her into the bathroom thinking maybe a warm bath might help." While defendant was bathing her, she fell into the bathwater, and he pulled her out of the water.

After defendant gave that explanation to the officers, the officers spoke with each other briefly. Detective Ronning asked defendant if he "[w]ould * * * still take a polygraph?" Ronning explained that he was not anticipating doing a polygraph immediately, maybe "tomorrow or the next day." The detective said, "I'd like to try to call you tomorrow, if I could." Defendant explained that he did not have his cell phone, and Ronning said, "Well, would you rather call me? I'll give you my card. You can call me, this is how to get a hold of me."

At some point during the interview at the hospital, the officers also asked defendant about reenacting or walking through the events he had just described while the officers videotaped him. Detective Baltzell thought that the interview "ended with an agreement that [defendant] would do a walk-through the next day." When asked whether he had "ask[ed defendant] to do that" or "t[old] him [he] needed that," Baltzell replied, "I

6

don't specifically recall." Detective Ronning remembered talking to defendant about the reenactment when he initially contacted him at the hospital. He explained that "it sounded like that would be okay with him" and that it was his impression that "it was generally fine."

Ronning testified at the suppression hearing that he spoke with defendant the next morning on the telephone about the video reenactment. Ronning could not remember, however, who had initiated the call, and the record contains virtually no testimony regarding what defendant and Ronning said during the call.[1] Ronning, Baltzell, and Kosmicki arrived at defendant's home around noon on July 8 with video equipment in hand. Ronning remembered saying, "[H]ey, we talked about this before. We would like to do a reenactment video. That's what we're here for." Defendant "invited [the officers] in, and said, yeah, he was willing to do that." The officers then videotaped defendant as he walked through, step by step, the events that he had described to the officers the night before at the hospital; that is, he reenacted the events of the previous day, commenting on how Aleeha struggled while he was pouring a bowl of cereal, how she slipped from his grasp, and how she hit her head on the counter and then fell to the floor. After that, he reenacted how he put her in the bathtub, how she accidentally fell face-down in the water, how he picked her up to dry her off, and how

---

[1] The following testimony from Ronning is the only evidence regarding the telephone call:

"I seem to remember a phone call. I don't remember -- I don't remember now if he called first, or I called. It was arranged that I would go over there, and it was by phone -- that we would be over there. And I don't recall. I just don't recall."

7

she began "gargling" and not responding. The video reenactment lasted approximately seven and a half minutes.

After the video reenactment, Ronning asked defendant if he was still interested in taking a polygraph examination. Defendant said that he was. The officers left, and defendant remained at his home with a friend. Ronning spoke with him later that afternoon to arrange for transportation. Approximately two to three hours after the video reenactment, defendant arrived at the Newberg Police Station. Initially, he waited in the lobby until the polygrapher, Officer Cobb, arrived. Cobb told defendant that he worked at the Gresham Police Department but that he also helped out other police agencies.[2] Cobb explained that he understood that defendant had told the Newberg police officers that he "didn't do anything intentionally to inflict any serious physical injury," and that Cobb was there "to -- you know, obviously, get the truth about that." Cobb explained:

"There's a detective side, there's your side, and they're trying to work out and trying to figure out where the truth is. I'm the person in the middle who's not working for either of you. Okay? I'm working for the truth, no matter what that truth is. * * * And that truth comes from your body itself. Now, what they call that is physiological data."

Cobb explained at some length how a polygraph measures a person's physiological data to determine whether the person's statements are truthful. As the trial court found, during that explanation, defendant was relaxed and was "even jok[ing]" with Cobb. After defendant said that he had no questions about how the polygraph worked,

---

[2] The trial court found that defendant "may not have understood that Cobb was a police officer," as opposed to a polygraph examiner who worked with police departments.

8

Cobb said:

> "Okay. Perfect. I'm going to have you read a consent form that -- keep in mind, this is a consent form, it's also got your Miranda Rights on it. I deal with people that are in custody, um, that are at the jail, all the time, in Multnomah County. I do these at Multnomah County Jail all the time. So, if you want to look at that, and read the entire thing and when you're done, you can sign it."

As defendant was completing the form, Cobb asked whether defendant had any questions about the form and whether he had read all of it. Defendant said that he had and had no questions.[3] Defendant then volunteered:

> "Defendant: I understand my rights have been given.

> "Cobb: Good.

> "Defendant: I can, at any time, decide that I would like a lawyer or not answer any further questions.

> "Cobb: Do you have a -- flash memory? Do you remember all those things that quick?

> "Defendant: Mmm-hmm."

After defendant signed the consent form and before he took the polygraph examination, Cobb asked defendant what had occurred on the morning of July 7 so that Cobb could devise appropriate questions to ask during the examination.[4] Before

---

[3] The polygraph consent form is a one-page form that divides into two parts. The first part states that defendant is voluntarily taking the polygraph examination, that the technique of polygraph testing has been explained to him, and that "Polygraph Examinations are not generally admissible in a court of law." The second part is separate from the first and is preceded by the statement, "**I also understand the following**." (Boldface in original.) The form then sets out the *Miranda* rights. Defendant signed the form immediately beneath the statement of his *Miranda* rights. Defendant has not argued that either the explanation of the polygraph examination or the statement of his *Miranda* rights was incomplete, inaccurate, or misleading in any way.

[4] Cobb sought to develop a set of questions that defendant could answer

administering the test, Cobb went over the questions he had drafted with defendant. After he administered the test and reviewed the results, Cobb explained to defendant that the score indicated that his responses to two questions were deceptive. One of those questions was whether defendant had intentionally inflicted any serious injury to Aleeha.[5]

Cobb asked defendant whether he had forgotten to tell him something that would explain the test results. At one point, Cobb left the room and Detectives Ronning and Baltzell came in. Both officers confronted defendant with the injuries that Aleeha had suffered, and defendant asked to talk to Cobb again and said that he did not want to talk to Baltzell. Baltzell left and Cobb reentered. Cobb told defendant that he did not think that defendant was lying but said that it still looked as if he were leaving something out. After the officers encouraged defendant to get it off his chest, defendant gave the officers a series of explanations. Initially, he said that Aleeha had fallen outside on concrete steps. Then, he said that he was on the toilet in the bathroom, that Aleeha was there and had been crying, and that he pushed her too hard, causing her to fall into the bathtub where she hit her head. He explained that he had been occupied with other matters and did not pull her out of the water immediately. Finally, he stated that Aleeha had been crying, that he had gotten frustrated, and that he had picked her up and thrown her against the wall, causing her to hit her head against the spigot as she fell back into the water in the bathtub. As before, defendant said that he left her in the water for five to ten

_____

"yes" or "no" without having to qualify his answers.

[5] Cobb never clearly identified the other question that, according the polygraph, defendant answered deceptively.

10

seconds while he attended to other matters.

After Aleeha died, the state charged defendant with murder by abuse, felony murder, manslaughter, assault, criminal mistreatment, and child neglect. Defendant moved to suppress the statements that he had made on July 7 and 8. He argued that the officers violated Article I, section 12, of the Oregon Constitution when they failed to advise him of his *Miranda* rights on July 7 and that the statements he made on July 8 were the product of the earlier violation.[6] Before setting out the trial court's resolution of defendant's arguments, we describe briefly the applicable legal rules.

Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect a person's right against compelled self-incrimination under that section, this court has held that, before questioning, the police must give *Miranda* warnings to a person who is in "full custody" or in circumstances that "create a setting which judges would and officers should recognize to be 'compelling.'" *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990) (quoting *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987)) (internal quotation marks omitted). When an officer violates *Miranda* by failing to give the requisite warnings, we suppress not only the statements that a suspect makes in direct response to unwarned questioning but also evidence that derives from or is a product of that constitutional violation. *State v. Vondehn*, 348 Or 462, 476, 236 P3d 691 (2010).

Applying those principles, the trial court ruled that defendant was not in

---

[6]     Defendant relies solely on Article I, section 12. He does not argue that the officers violated the Fifth Amendment.

custody when he went with the officers to the police station on July 7 and that the circumstances did not become "compelling" until midway through the police station interview.[7] Because the trial court concluded that Detective Ronning should have but did not advise defendant of his *Miranda* rights at that point, it suppressed all the statements that defendant made at the police station after the circumstances became compelling. The trial court also ruled that the circumstances were compelling at the hospital and that the officers' failure to advise defendant of his rights required that the statements he made there also be suppressed.

The trial court initially ruled that the statements that defendant made the next day during the video reenactment were not the product of the earlier *Miranda* violations. It reasoned that those statements were neither made under compelling circumstances nor "derived from or tainted by the prior questioning under compelling circumstances" on July 7. Defendant moved for reconsideration, and the trial court reversed its ruling on that issue. It found that "the re-enactment video was tainted by evidence previously suppressed by the Court, and so must also be suppressed."

Finally, the trial court ruled that the statements defendant made on July 8 immediately before the polygraph examination were not the product of the violations on July 7 but that the statements defendant made after the polygraph examination were. Regarding the pre-polygraph statements, the trial court reasoned that the "advice of rights

---

[7] Specifically, the trial court found that, beginning with the second part of the interview at the police station, the circumstances were sufficiently compelling to require *Miranda* warnings.

12

[in the consent form that defendant signed] was adequate in [the] circumstances." The court found that defendant "was adequately advised of his *Miranda* rights and knowingly, intelligently, and voluntarily waived those rights. Statements in the pre-test interview are admissible."

The trial court reached a different conclusion regarding defendant's statements after he took the polygraph examination. It reasoned:

"The post-examination interview *was* distinctly under compelling circumstances -- it was confrontational and had all the earmarks under case law for compelling circumstances. The advice of rights, however, was not adequate to remedy the impact of prior compelling circumstances interviews that are now suppressed. It was more of a speed bump than a clear reminder of the rights that would become critical in the post-examination interview * * *."

(Emphasis in original.) The court accordingly ruled that defendant's post-polygraph statements should be suppressed.

The trial court entered a pretrial order reflecting those rulings. The state has appealed and defendant has cross-appealed from that order. *See* ORS 138.060(2) (authorizing the state to appeal to this court from certain pretrial orders in murder cases); ORS 138.040 (authorizing a cross-appeal when the state appeals pursuant to ORS 138.060(2)(a)). On appeal, the state does not challenge the trial court's rulings that the officers violated Article I, section 12, when they questioned defendant at the police station and the hospital on July 7 without advising him of his *Miranda* rights. Rather, the state assigns error only to the trial court's rulings that the statements defendant made on July 8 during the video reenactment and after the polygraph examination were the product of the *Miranda* violations the day before. On cross-appeal, defendant assigns

13

error to the ruling that his pre-polygraph statements were not the product of the earlier violations.

We begin with the question whether the trial court should have suppressed the statements that defendant made during the video reenactment. On that question, defendant does not argue that he was either in custody during the video reenactment or that the circumstances were sufficiently compelling to require the officers to advise him of his *Miranda* rights. Rather, he contends (and the trial court ruled) that the statements that he made during the video reenactment should be suppressed because they were tainted by the *Miranda* violations the day before.

In resolving that issue, we note that this court held in *Vondehn* that officers violate Article I, section 12, when they fail to give *Miranda* warnings before engaging in custodial interrogation. 348 Or at 475. It follows from that holding that we suppress not only a defendant's statements obtained in violation of *Miranda* but also evidence derived from that violation. *Id.* at 475-76; *see id.* at 487 (Linder, J., concurring) (explaining that, when officers fail to provide the requisite *Miranda* warnings, "we properly ask whether any subsequently obtained evidence, physical or testimonial, is sufficiently a product of that violation to require suppression along with any statements made in direct response to unwarned custodial interrogation"). Put differently, because the failure to give *Miranda* warnings, when required, is itself a constitutional violation, the remedy for that violation extends not only to a defendant's unwarned responses to an officer's questions but also to the physical and testimonial evidence that is the product of that violation. *See State v. Moore/Coen*, 349 Or 371, 385, 245 P3d 101 (2010) (testimonial evidence); *Vondehn*, 348

14

Or at 476 (physical evidence).

This court has looked to the totality of the circumstances in determining whether physical or testimonial evidence derives from or is the product of an earlier *Miranda* violation. *State v. Foster*, 288 Or 649, 655, 607 P2d 173 (1980); *State v. Mendacino*, 288 Or 231, 238, 603 P2d 1376 (1979); *see Vondehn*, 348 Or at 482 (directing courts to consider "all relevant circumstances" in deciding whether belated *Miranda* warnings were effective in ensuring a knowing and voluntary waiver of rights).[8] Among other things, the court has considered the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements. *See, e.g.*, *Moore/Coen*, 349 Or at 385 (focusing on the state's use of the unwarned statements in determining whether the defendant's subsequent testimony was tainted); *Mendacino*, 288 Or at 237-38 (considering the effect of a 72-hour break in time when the defendant had remained in custody and the officers had continued to question him despite his requests for counsel). The inquiry is a fact-intensive one -- whether,

---

[8]     In this case, defendant was not in custody or compelling circumstances when he participated in the video reenactment, and the question is whether the statements he made during the video reenactment derived from the *Miranda* violation the day before. Accordingly, the standard set out above applies to derivative statements; it does not apply to statements made in direct response to questions posed in violation of *Miranda*. Finally, we note that a different calculus applies when a defendant remains in custody and officers seek to remedy an earlier *Miranda* violation. *Vondehn*, 348 Or at 481 (asking whether belated *Miranda* warnings accurately and effectively "gave the suspect information necessary to a valid waiver of the right against self-incrimination").

15

considering all the circumstances, a defendant's later decision to speak to officers is sufficiently a product of an earlier *Miranda* violation that suppression is necessary to vindicate the defendant's Article I, section 12, rights.[9]

With those considerations in mind, we turn to the question whether the statements that defendant made during the video reenactment on July 8 were a product of the *Miranda* violations the night before. On that question, the state notes that 15 to 16 hours had passed between the time that the officers obtained defendant's statements at the hospital and the time he reenacted those statements the next day. Additionally, the circumstances at the time of the video reenactment were not compelling. The reenactment occurred at defendant's home, and the officers did not challenge or confront defendant during the reenactment. Finally, we note that the *Miranda* violations the day before were not flagrant, as the violations in *Foster* and *Mendacino* had been. This is not a case in which the officers advised defendant of his *Miranda* rights and then proceeded to question him despite his repeated requests for counsel, as the officers did in *Foster* and *Mendacino*. Rather, this is a case in which, according to the trial court's unchallenged

---

[9]      Defendant argues that we should apply the particular methodology set out in *State v. Hall*, 339 Or 7, 24-25, 115 P3d 908 (2005), to determine whether evidence is the product of a *Miranda* violation. The *Hall* methodology applies to violations of Article I, section 9. It does not apply to violations of Article I, section 12. *Cf. Brown v. Illinois*, 422 US 590, 602-03, 95 S Ct 2254, 45 L Ed 2d 416 (1975) (explaining that the question whether a statement is the product of a Fifth Amendment violation differs from the question whether it is a product of a Fourth Amendment violation). In *Vondehn*, we cited *Hall* once in describing the Court of Appeals' reasoning, *see* 348 Or at 465, but we did not cite *Hall* afterwards or apply its methodology in determining whether the physical evidence in that case derived from the *Miranda* violation, *see id.* at 476. Similarly, we do not apply *Hall*'s methodology here.

16

ruling, the officers failed to recognize that the circumstances had become sufficiently compelling to require *Miranda* warnings.

We recognize, as the court did in *Mendacino*, that a change in time and circumstances can be sufficient to dissipate the effects of an earlier *Miranda* violation. *See Mendacino*, 288 Or at 237 (recognizing that possibility). In this case, however, we are not persuaded that the change in time and circumstances was sufficient. Of primary concern is the use that the officers made of defendant's unwarned statements. *Cf. Moore/Coen*, 349 Or at 385 (focusing on the state's use of the defendant's unwarned statements at trial in determining whether those statements tainted the defendant's subsequent trial testimony). Specifically, at the end of the hospital interview on the night of July 7, the officers obtained from defendant, in violation of his *Miranda* rights, a description of how Aleeha had struggled while he was holding her and how she had fallen from his grasp and hit her head on the counter and then the floor. Defendant then told the officers how he gave Aleeha a bath to calm her but that she accidentally tipped over in the bathtub.

The next day, the officers videotaped defendant while he reenacted the very events that he had described the night before in violation of his constitutional rights. Not only did the video reenactment memorialize on film the statements obtained in violation of defendant's rights the night before, but defendant's unwarned statements at the hospital became, in effect, the script that he acted out the next day while the officers videotaped him. In that circumstance, it is difficult to see how the video reenactment was not the product of the undisputed *Miranda* violation the night before. No advice of *Miranda*

17

rights intervened to break the causal chain. Indeed, there is no evidence in this record of what the officers said to defendant between the time that they obtained his agreement to participate in the video reenactment at the hospital and the time that they appeared on his doorstep the next day with video equipment in hand. Rather, the record shows only that a telephone conversation occurred sometime on the morning of July 8 before the officers came to defendant's home at noon, but the officers could not remember who had initiated the call or what was said.[10]

We conclude that, on those facts, the video reenactment was the product of the *Miranda* violation the day before. In reaching that conclusion, we do not mean to suggest that a violation of a suspect's *Miranda* rights forever precludes that person from voluntarily choosing to talk to the police about the same subject, even in the absence of intervening *Miranda* warnings. Rather, the identity between the two sets of statements and the state's use of defendant's unwarned statements in the video reenactment the next day persuade us that the break in time and the absence of compelling circumstances during the reenactment were not sufficient to break the causal chain in this case. We accordingly agree with the trial court that the video reenactment was the product of the *Miranda* violation the night before and should be suppressed.

---

[10]    Because the trial court changed its ruling on the video reenactment on reconsideration, the state and defendant disagree whether the trial court implicitly found that Detective Ronning or defendant initiated the telephone call that morning. Given Ronning's testimony that he could not remember who initiated the call, we think that the record does not permit an inference one way or the other. Beyond that, the more relevant question is not who called whom but what was said during the telephone call. The record is silent on that point.

18

The remaining question is whether the statements that defendant made later that day before he took the polygraph examination and also the statements that he made after taking the examination were the product of the *Miranda* violations the day before.[11] Those statements differ in one significant respect from the statements defendant made during the video reenactment. Before making the pre- and post-polygraph statements, defendant received a consent form containing his *Miranda* rights, which he read and signed. As both parties recognize, the question regarding the pre- and post-polygraph statements is whether the *Miranda* warnings set out in the consent form "effectively, although belatedly, gave [defendant] the information necessary to a valid waiver of the right against self-incrimination." *Vondehn*, 348 Or at 481.

In *Vondehn*, this court looked to the plurality's decision in *Missouri v. Seibert*, 542 US 600, 124 S Ct 2601, 159 L Ed 2d 643 (2004), to illustrate when belated *Miranda* warnings will (and will not) be effective under Article I, section 12. *See* 348 Or at 481. The court reasoned:

> "The problem that *Seibert* demonstrates * * * is that when the police
> question first and warn later, their exhibition and exercise of authority and
> violation of the defendant's constitutional rights may communicate to a
> defendant, as the Court believed they did in that case, that, before the
> defendant will be released, he or she must answer the questions asked. In
> that circumstance, the police not only fail to provide the defendant with the
> information necessary to a valid waiver -- that the defendant has a right to
> remain silent and to confer with an attorney -- the police also convey a

[11] The state does not seek to use either the answers that defendant gave during the polygraph examination or the results of that examination. Rather, the only statements that are at issue are the statements that defendant made before he took the polygraph examination and the statements that he made after Cobb reported the results of the examination to him.

contrary message. In that situation, when the police later administer *Miranda* warnings, we cannot assume that the mere recitation of *Miranda* warnings is sufficient to serve the intended informative function.

> "That being said, we note that *Seibert* is at one end of the range of the factual circumstances that present the issue that we address. [*Oregon v. Elstad,* 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985)] is at the other. Not every instance in which the police question first and warn later communicates a mixed message."

*Id.* at 481. This court explained that the extent to which police officers convey a mixed message and the extent to which later warnings remedy any mixed message require "consider[ation of] all relevant circumstances, including those facts to which the plurality in *Seibert* pointed." *Id.* at 482.[12]

We explained in *Vondehn* that we "f[ou]nd the reasoning in [*Seibert* and *Elstad*] helpful because they focus, as we must, on the source and purpose for the *Miranda* requirement and the exclusion of evidence obtained when *Miranda* warnings are not given as required." *Vondehn*, 348 Or at 480; *see also id.* at 481 ("[W]e adopt the reasoning and the analysis of the *Seibert* plurality as our own."). Similarly, we think that the reasoning in those cases provides guidance in determining when belated *Miranda* warnings will and will not suffice. Put differently, we do not consider the factors identified in *Seibert* and *Vondehn* in a vacuum. Rather, we consider them in the context

---

[12] The plurality in *Seibert* identified five facts that bore on the effectiveness of the *Miranda* warnings in that case -- the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the statements given by the suspect, the timing and setting of the first and the second interrogation sessions, the continuity of police personnel, the degree to which the interrogator's questions treated the second round of interrogation as continuous with the first, and whether the police cautioned that the earlier unwarned statement could not be used in any subsequent prosecution. *See Vondehn*, 348 Or at 482 (restating those facts).

20

of the cases that relied on them to gauge their relevance in determining when belated *Miranda* warnings will be effective.

The specific practice at issue in *Seibert* was the use of a technique where the officers interrogated the defendant without first advising her of her *Miranda* rights. After the defendant admitted her guilt, the officers took a short break, turned on a tape recorder, advised the defendant of her *Miranda* rights, and then prompted her to repeat what she had just admitted. *Seibert*, 542 US at 604-05 (plurality opinion). In concluding that the *Miranda* warnings were not effective in those circumstances, the *Seibert* plurality reasoned that the suspect's first, unwarned interrogation left "little, if anything, of incriminating potential * * * unsaid," making it "unnatural" not to "repeat at the second stage what had been said before." *Id.* at 616-17. The plurality was concerned that the *Miranda* warnings did not "effectively advise the suspect that [s]he had a real choice about giving an admissible statement" because the unwarned and warned interrogations blended into one "continuum." *Id.* at 612, 617. By contrast, "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice [to render belated *Miranda* warnings effective] in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* at 622 (Kennedy, J., concurring in the judgment).

Although the *Seibert* plurality reasoned that the warnings in that case were not effective, it also reaffirmed its earlier decision in *Elstad*, where the Court had held that the defendant's unwarned admission of guilt did not render later *Miranda* warnings

ineffective. *Seibert*, 542 US at 614-16 (discussing *Elstad*).[13] The *Seibert* plurality explained that, because the warned questioning in *Elstad* "present[ed] a markedly different experience" from the unwarned questioning, the *Miranda* warnings presented the defendant in *Elstad* with "a genuine choice whether to follow up on [his] earlier [unwarned] admission." *Id.* at 615-16.

With that background in mind, we turn to the facts of this case. We note, as an initial matter, that this is not a case, as in *Seibert*, where the unwarned interrogation left "little, if anything, of incriminating potential * * * unsaid," making it "unnatural" not to "repeat at the second stage [of the interrogation] what had been said before." *See Seibert*, 542 US at 616-17 (plurality opinion). When the officers questioned defendant on July 7, he did not admit to having intentionally injured Aleeha. Rather, he told them that Aleeha's injuries were either unexplained or the result of an accident. To paraphrase a later Supreme Court case applying *Seibert*, "unlike in *Seibert*, there is no concern here that police gave [defendant] *Miranda* warnings and then led him to repeat an earlier murder confession [or a confession that he had intentionally harmed Aleeha], because there was no earlier confession to repeat." *See Bobby v. Dixon*, ___ US ___, 132 S Ct

---

[13] In *Elstad*, the officers arrested the defendant at his home and, before advising him of his *Miranda* rights, asked whether he had been involved in a burglary. *Elstad*, 470 US at 300-01. The defendant admitted being there, and the officers took him to the Polk County sheriff's office where, one hour later, they advised him of his rights and asked if he wished to speak with the officers. *Id.* at 301. He said that he did and gave a full statement to the officers admitting his part in the burglary. *Id.* The Court held that the belated *Miranda* warnings were sufficient in that case to ensure a voluntary waiver of the defendant's Fifth Amendment rights.

26, 31, 181 L Ed 2d 328 (2011) (applying the plurality's reasoning in *Seibert*).[14]

Nor is this a case in which the two phases of questioning blended into a "continuum," as they did in *Seibert*. Rather, two to three hours separated the video reenactment from the polygraph examination.[15] During that time, defendant remained at his home with a friend before going to the police station for the polygraph examination. Not only was there a substantial break in time, but the central figure in the polygraph examination, the polygrapher, was someone new, who was there in a different role from the officers who had questioned defendant the day before and who had conducted the video reenactment earlier that day. We also note that the polygraph examination itself was different from the questioning the day before and the video reenactment. As the polygraph examiner explained the test to defendant, it was a scientific means of determining whether defendant was truthful when he said that he had not intentionally harmed Aleeha. The polygraph examination that occasioned defendant's waiver of his *Miranda* rights presented "a markedly different experience" from the officers' questioning the day before and the video reenactment earlier that day. *Cf. Seibert*, 542 US at 615

---

[14]     In *Bobby*, the police questioned the defendant for more than two hours after they arrested him without advising him of his *Miranda* rights. 132 S Ct at 28. During that time, he denied any involvement in a murder. Although the unwarned questioning in *Bobby* was significantly lengthier than the unwarned questioning in *Elstad*, the Court reasoned that the circumstances in *Bobby* were like *Elstad* and unlike *Seibert* because the defendant in *Bobby* had not admitted complicity in the murder during the unwarned questioning. *Id.* at 31. The same reasoning applies here.

[15]     There is a question, which neither side explores, whether we should measure the break in time from the *Miranda* violation at the hospital or from the video reenactment the next day, which was a product of that *Miranda* violation. We need not decide that issue because, even if we measure the break in time from the video reenactment, the break in time was still significant.

(plurality opinion) (explaining why the warnings in *Elstad* were effective).

Defendant argues, however, that Officer Cobb minimized the significance of the *Miranda* warnings when he told defendant:

"I'm going to have you read a consent form that -- keep in mind, this is a consent form, it's also got your *Miranda* rights on it.  I deal with people that are in custody, um, that are at the jail, all the time, in Multnomah County.  I do these at Multnomah County Jail all the time.  So, if you want to look at that, and read the entire thing and when you're done, you can sign it."

Cobb's statement can be understood to suggest that, because defendant was not in custody, *Miranda* warnings were not necessary.[16]  In all events, defendant made clear that he appreciated the rights that *Miranda* confers.  After reading the consent form, defendant volunteered that he understood that his "rights have been given" and that "I can, at any time, decide that I would like a lawyer or not answer any further questions."  Considering all the circumstances, we conclude that the advice of rights was effective to ensure a knowing and voluntary waiver of defendant's right to remain silent and also to remedy any taint from the *Miranda* violations the preceding day.

One final issue remains regarding defendant's statements after Cobb advised him of his *Miranda* rights.  The trial court drew a distinction between defendant's pre- and post-polygraph statements.  It ruled that defendant's pre-polygraph statements were not the product of the *Miranda* violations the day before but that his post-polygraph

---

[16]    When defendant agreed to take the polygraph examination and waive his *Miranda* rights, he was not in custody or compelling circumstances.  In that respect, Cobb correctly suggested that *Miranda* warnings were not necessary, and his statement served to reduce any pressure on defendant.  However, the *Miranda* warnings also played a role in breaking the causal connection between the *Miranda* violations the day before and defendant's statements during the polygraph examination.  In that respect, Cobb's statement downplayed the warnings' significance.

24

statements were. The trial court based that distinction on its conclusion that the circumstances surrounding the pre-polygraph interview were not compelling but that they became compelling during the post-polygraph interview. If, as we hold, the *Miranda* warnings that Cobb administered were effective to purge the taint of the prior violation and ensure a knowing and voluntary waiver of defendant's right to remain silent, then defendant's subsequent statements were admissible unless those statements were "actually coerced" within the meaning of Article I, section 12, or unless fresh warnings were necessary after Cobb reported the polygraph results to defendant.

On the first issue, defendant does not argue that the officers' conduct constituted actual coercion. On the second, we note that the trial court ruled that, after the polygraph examination, the circumstances became sufficiently compelling to require *Miranda* rights. Cobb, however, had advised defendant of his *Miranda* rights before defendant agreed to take the examination. He did not need to readvise defendant of his *Miranda* rights after reporting the results of the polygraph examination to him. *See State v. Stevens*, 311 Or 119, 138, 806 P2d 92 (1991) (officers were not required to readvise the defendant of his *Miranda* rights when they moved him from one car to another and a second officer began questioning him); Wayne R. LaFave, Jerold H. Israel, Nancy J. King, & Orin S. Kerr, 2 *Criminal Procedure* § 6.8(b), 805 (3d ed 2007) (explaining that it is "generally accepted that fresh warnings are not required after the passage of just a few hours"); *Territory of Guam v. Dela Pena*, 72 F3d 767, 769-70 (9th Cir 1995) (statements made during custodial interrogation were admissible because the police had advised the defendant of his *Miranda* rights several hours earlier before he was in custody). If the

25

warnings were effective before the polygraph examination, as we hold they were, they were effective afterwards as well.

Article I, section 12, does not require that the pre- and post-polygraph statements that defendant made after being advised of his rights on July 8 be suppressed. We accordingly reverse the trial court's pretrial order to the extent that it suppressed defendant's post-polygraph statements and affirm its order to the extent that it did not suppress his pre-polygraph statements. Finally, we affirm its order to the extent that it suppressed the video reenactment.

The order of the circuit court is affirmed in part and reversed in part.

**DE MUNIZ, C. J.,** concurring.

A significant portion of this case turns on the polygraph consent form that defendant signed while at the Newberg Police Station. My agreement with both the outcome here and the analysis used to reach it stems in large part from the fact that defendant has never argued that the terms of his consent were unclear, or that he was misled by the form he signed, or that the effect of his signature had somehow been misrepresented to him.

I write specially, however, to note that nothing in Oregon law currently prescribes a uniform text for criminal polygraph consent forms, nor requires law enforcement officials to explain the reach and effect of that consent to the defendants from whom they solicit it. The result can be added layers of litigation and expense in criminal matters that might have been avoided -- or at least truncated -- had all the relevant aspects of a defendant's consent been unambiguously presented as a required

26

prelude to the polygraph examination itself.

The polygraph consent form discussed briefly in footnote 3 of the majority's opinion illustrates some of my concerns. The text is set out below. It provides:

"I, _____, do hereby voluntarily, without duress, coercion, promise of reward or immunity, submit to a polygraph examination. I have had the technique of polygraph testing explained to my satisfaction. I further authorize the release of the results of said examination and the information obtained to those parties having an interest in this examination. I understand that I cannot be forced to take this test by anyone and I have the right, at any time, to leave the examination room. I also understand that Polygraph Examinations are not generally admissible in a court of law. I also understand that this examination can at anytime be recorded by audio or video type recordings. To the best of my knowledge, I have no physical or mental condition which would prevent me from taking this examination.

"I also understand the following:

"1. I have the right to remain silent.

"2. Anything I say can and will be used against me in a court of law.

"3. I have the right to talk to a lawyer and have him present with me while I am being questioned.

"4. If I cannot afford to hire a lawyer, one will be appointed to represent me at no cost before any questioning, if I wish.

"5. I can decide at any time to exercise these rights and not answer any questions or make any statements."

The form, of course, arguably serves double duty; signing it is meant to signal voluntary consent to a polygraph examination while acknowledging notice of the accompanying *Miranda* warnings. In practice, however, the manner in which *Miranda* warnings are presented to polygraph examinees can frequently obfuscate the clarity of the rights they are intended to convey, while muddying the scope of the examinee's consent.

First, it is easy for the importance of *Miranda* warnings to be tacitly downplayed before a polygraph test begins.  Here, for example, after pointing out the written *Miranda* warnings that were part of the consent form used in this case, the polygraph examiner immediately explained,

> "I deal with people that are in custody, um, that are at the jail, all the time, in Multnomah County.  I do these at Multnomah County Jail all the time."

On the one hand, that statement could be viewed as small talk designed to put a test subject at ease.  On the other, it could be viewed as implying that the *Miranda* warnings on defendant's consent form were surplus provisions, a statement of rights only for, and applicable to, polygraph test subjects who were already incarcerated.  Whatever motive was at work, of course, is of no moment here; defendant adequately demonstrated that he understood his rights by his own voluntary recitation prior to his polygraph examination.  Had that not been the case, however, the motivation behind the polygraph examiner's statement could easily have become another issue for our courts to resolve, increasing both the time and money needed to conclude this matter.  Those resources are becoming scarcer with each passing biennium; in my view, they should not be expended on matters that could be avoided altogether by simply requiring clarity and candor to be integrated as policy requirements in conducting criminal polygraph examinations.

Second, the scope of examinees' *Miranda* rights is rarely explained to examinees prior to criminal polygraph examinations.  Again, this case could be used to illustrate the problem.  After defendant had completed his test, the polygraph examiner informed him that several of his answers had been deceptive.  What followed were a

28

string of interrogatories: Had defendant forgotten to mention something that would explain those results? Did defendant want to get something off his chest? In and of themselves, those questions are inoffensive -- unless, of course, the one being questioned is unaware that he or she does not have to answer. It is not uncommon for examinees to receive some form of invitation to shrive themselves after a polygraph test, regardless of its outcome. There is nothing, however, in most polygraph consent forms -- certainly not in the one used in this case -- that alerts examinees to the likelihood of that kind of post-test interrogation, much less the applicability of their *Miranda* rights in those circumstances.

And finally, the terms of consent presented to examinees often serve only to increase the ambiguity of the *Miranda* rights that they are then called upon to acknowledge. Here, for example, the following statement was on the consent form defendant signed: "I also understand that Polygraph Examinations are not generally admissible in a court of law." Is that a reference to the fact of the examination, the results of the examination, or something else altogether? Should examinees infer that anything they say immediately before, after, or during their tests will be inadmissible -- or not? When those questions are raised, it is the job of our courts to sort them out. It is difficult, however, to speed the plow in that regard when ambiguity becomes the rule rather than the exception.

To reiterate: My complaint is not that the vagueness surrounding consent in polygraph cases renders the resulting information involuntary; it is that such vagueness can unnecessarily raise the cost of adjudicating criminal matters in Oregon, sometimes to

levels that are simply unacceptable. In *State v. Harberts*, 331 Or 72, 11 P3d 641 (2000), the Oregon Supreme Court overturned an aggravated murder conviction and death sentence because of the state's failure to bring the defendant to trial "without delay" as required under the Oregon Constitution. Much of the five-year period at issue in that case had been taken up in pretrial litigation over the voluntariness of statements made by the defendant immediately after his polygraph test.

We can and should do better. Requiring informed consent in criminal polygraph examinations to be truly "informed" as a statutory matter would go far toward making that so.