WALTERS, J.,
dissenting.
This case begins with a conceded violation of the Oregon Constitution and once again, ends without legal consequence. See State v. Unger, 356 Or 59, 103, 333 P3d 1009 (2014) (Walters, J., dissenting). In this case, a deputy stopped defendant for not wearing his seat belt, handcuffed him, searched him, and placed him in the backseat of a patrol car. The deputy then committed a blatant and conceded constitutional violation when he interrogated defendant about illegal activity without informing defendant that he had a constitutional right to remain silent. Although the government is precluded from obtaining “a criminal conviction through the use of evidence obtained in violation of [constitutional] rights,” State v. Davis, 313 Or 246, 253, 834 P2d 1008 (1992) (citing State v. Davis, 295 Or 227, 666 P2d 802 (1983)), and an individual has a right to suppression of illegally obtained evidence to preserve the individual’s rights “to the same extent as if the government’s officers had stayed within the law,” id., the majority holds otherwise. I respectfully dissent.
In Unger, this court considered the appropriate consequences when officers violate the constitution. The defendant in that case was in his own home, not in compelling circumstances or subject to interrogation, when he consented to search. The court held that the evidence that officers obtained as a result need not be suppressed. The court reasoned that the fact that the officers had violated Article I, section 9, by entering the defendant’s backyard did not affect the defendant’s decision to consent to search. Unger, 356 Or at 92.
*391 Unlike Article I, section 9, of the Oregon Constitution, Article I, section 12, does not prohibit an officer from entering private property without a warrant. Rather, it applies when an officer holds an individual in compelling circumstances and prohibits the officer from conducting a criminal interrogation without first warning the detained individual that he or she has the right to remain silent and to consult a lawyer. Despite those differences, the question that is presented when an officer violates Article I, section 12, is the same as the question that is presented when an officer violates Article I, section 9: Did the evidence “derive from” the constitutional violation? See Unger, 356 Or at 80 (“[0]ur task is to determine whether police ‘exploited’ or ‘took advantage of” or ‘traded on’ their unlawful conduct to obtain consent, or — examined from the perspective of the consent — whether the consent was ‘tainted’ because it was ‘derived from’ or was a ‘product of the unlawful conduct.”); State v. Vondehn, 348 Or 462, 475-76, 236 P3d 691 (2010) (court’s task is to determine whether evidence “derived from” an Article I, section 12, violation).
I understand and agree with the majority and concurrence that the principles that underlie the exclusionary rule and its attenuation exceptions apply equally to violations of both Article I, section 9, and Article I, section 12, and that the same factors may be relevant in deciding whether evidence that officers obtain can be used to convict a defendant. 357 Or at 378; id. at 386 (Brewer, J., concurring). However, one of those factors is the nature of the police misconduct. Unger, 356 Or at 81. It seems to me that an officer’s unlawful entry onto an individual’s property when the individual is not in compelling circumstances may have a different effect on the individual’s consent to search than does an officer’s failure to advise an individual held in compelling circumstances that the individual has a right to remain silent.
In this case, for example, the deputy’s violation of Article I, section 12, had a more direct causative effect on defendant’s consent to search than did the violation of Article I, section 9, that the court considered in Unger. Here, the deputy had handcuffed defendant and placed him in a *392 patrol car, when, without telling defendant that he had the right to remain silent and to consult a lawyer, the deputy asked him for incriminating evidence. Thus, in this case, unlike in Unger, defendant was held in compelling circumstances and was entitled to information that the defendant in Unger was not entitled to receive. And, unlike in Unger, the majority concludes that defendant’s consent to search derived from the deputy’s constitutional violation. As the majority acknowledges, it was the deputy’s question and constitutional violation that prompted defendant’s unknowing response — the consent to search — and that response must be suppressed. 357 Or at 376. Thus, although the principles underlying the exclusionary rule are the same, its application in this case is different from its application in Unger and compels a different result.
Had the majority adhered to the “totality of the circumstances” analysis that it has used in past Article I, section 12, cases and to its reasoning in Unger, it would have suppressed not only defendant’s response to the deputy’s question, but also the physical evidence that the deputies obtained as a consequence of that response. Just five years ago, this court discussed the basis for suppression of evidence obtained in violation of Article I, section 12, and flatly rejected the state’s argument that the “mere failure to provide Miranda warnings” requires only suppression of statements made in response to the unwarned questions and not suppression of the physical evidence obtained. Vondehn, 348 Or at 475-76. In Vondehn, the officer asked the defendant three unwarned questions: (1) Is this your backpack? (2) Does it contain marijuana? (3) Can I search it? The defendant answered the first two questions affirmatively and, in response to the third, voluntarily consented to the search of his backpack. Nevertheless, the court concluded that the trial court had been required to suppress the defendant’s answers to all three questions and the marijuana that the officer had obtained as a result of the defendant’s consent. Id. at 476-77. The court held that, “[w]hen the police violate Article I, section 12, whether that violation consists of ‘actual coercion’ or the failure to give the warnings necessary to a knowing and voluntary waiver, the state is precluded from using evidence derived from that violation to obtain a *393 criminal conviction,” including the “physical evidence that is derived from that constitutional violation.” Id. at 475-76.
The majority does not overrule Vondehn, but distinguishes it on its facts, as does the concurrence. The majority points out that “Robeson’s unwarned question in this case was open-ended; defendant’s direct response to the question was exculpatory; and he invited the deputies to search his car without an express request for consent.” 357 Or at 374. The concurrence says that, in this case, the detention was brief, only one question was asked and not coercively, and the deputy did not seek consent to search. Id. at 389-90 (Brewer, J., concurring).
Those factual differences exist, but they are not of consequence. An unwarned question is an unwarned question, no matter how open ended. Defendant’s response to the deputy’s unwarned question was of a piece, and it was inculpatory. And defendant’s “invitation to search” was not any less prompted by the deputy’s question than it would have been if the deputy had asked defendant for consent. In Unger, the court took pains to explain that there is little to distinguish “unprompted or volunteered consent,” like that in State v. Kennedy, 290 Or 493, 624 P2d 99 (1981), and State v. Rodriguez, 317 Or 27, 854 P2d 399 (1993), from consent that is given in response to a request for consent. Both types of consents, the court reasoned in Unger, are “prompted by the officer’s question about drugs and guns.” Unger, 356 Or at 79. The more salient inquiry, the court held in Unger, is not whether the officer sought consent, but “whether the consent was ‘tainted’ because it was ‘derived from’ or was a ‘product of the unlawful conduct.” Id. at 80-81.
I agree. The question at hand is: Did defendant’s response, which included a consent to search, derive from the constitutional violation? “Yes,” the majority says, “it did.” 357 Or at 376. The majority is correct. A response to an unwarned question that is prompted by, and results from, the question is a direct link in the causal chain, not independent of it. Suppression of the response — the consent to search — should also result in suppression of the evidence that is a product of that response.
*394 That does not mean that Article I, section 12, sets, as the concurrence would have it, “an insurmountable bar” to the admission of evidence obtained pursuant to a custodial consent to search. Id. at 389 (Brewer, J., concurring). In State v. Jarnagin, 351 Or 703, 713, 277 P3d 535 (2012), the court considered the kinds of facts that can attenuate a Miranda violation, and I do not oppose consideration of a response to unwarned questions as one factor in the alternative analysis. But I do think it important to look at how we have applied the “totality of the circumstances” test in the past.
In Jarnagin, officers questioned the defendant about injuries to an eight-month-old victim at the police station and later at the hospital where the victim had been taken. The officers did not give the defendant the required Miranda warnings, and the defendant described his role in the victim’s injuries. The defendant also told the officers that he would reenact those events. The next day, the defendant participated in a video reenactment at his home. The circumstances were not compelling — the officers did not challenge or confront the defendant during the reenactment — and the officers again did not administer Miranda warnings. At trial, the court granted the defendant’s motion to suppress not only the defendant’s statements at the station and the hospital, but also the videotape.
On review in this court, the state argued that the officers’ Miranda violations at the station and the hospital did not require suppression of the videotape. The court disagreed. The court acknowledged that a change in time and circumstances can be sufficient to dissipate the effects of an earlier Miranda violation and that the Miranda violations at the station and the hospital “were not flagrant.” Id. at 717. The officers had not physically restrained the defendant and had advised him that he was not under arrest. Id. “[AJccording to the trial court’s unchallenged ruling,” the court explained, “the officers [had] failed to recognize that the circumstances had become sufficiently compelling to require Miranda warnings.” Id. Nevertheless, the court required suppression of the videotape, reasoning that the defendant had reenacted the same events that he had described earlier *395 and “ [n] o advice of Miranda rights had intervened to break the causal chain.” Id. at 718. Significantly, the court did not view the defendant’s voluntary agreement or his voluntary participation in the reenactment as breaking the causal chain. See id. at 719.
Neither the majority nor the concurrence rest their conclusions on the types of facts recognized in Jarnagin as attenuating the taint of a Miranda violation — a change in time or circumstances, a lifting of restraints, an officer’s failure to recognize that the circumstances were so compelling that Miranda warnings were required, or the fact that belated Miranda warnings were given. Instead, the primary fact that the majority and concurrence deem essential is a fact that was of no consequence in Vondehn or Jarnagin and that pertains in virtually every instance in which a defendant seeks to exclude evidence obtained as a result of a “mere” Miranda violation — the fact that defendant’s response was volitional and the deputy did not coerce defendant’s response.
An officer’s coercion can, of course, make a defendant’s response involuntary. See State v. Foster, 288 Or 649, 656, 607 P2d 173 (1980) (defendant’s waiver of right to counsel not voluntary where police persisted in repeated efforts to persuade defendant to waive right); see also State v. Mendacino, 288 Or 231, 238, 603 P2d 1376 (1979) (later confession inadmissible where “coercive conditions which resulted in *** [earlier] confessions were not effectively removed”). But, as the court made clear in Unger, volun-tariness alone does not necessarily make evidence obtained in violation of the constitution admissible. 356 Or at 79. Miranda warnings are required in circumstances that are compelling but not coercive to ensure that a defendant speaks not out of compulsion but as a result of a knowing, deliberate choice. The purpose of Miranda warnings is to ensure that a defendant knows that he or she has a right to remain silent and to consult a lawyer. Without that information, a waiver of rights, even a voluntary waiver, is invalid. Jarnagin, 351 Or at 716; Vondehn, 348 Or at 476; see State v. Joslin, 332 Or 373, 386, 29 P3d 1112 (2001) (holding that defendant’s waiver of Article I, section 12, rights, “although voluntary, *396 was not knowingly made and, therefore, was invalid”). Thus, as the majority acknowledges, the failure to give Miranda warnings demands suppression of derivative evidence even when the consent to search is voluntary. Vondehn, 348 Or at 476-77.
In this case, even if defendant’s response to the deputy’s unwarned interrogation, including his consent to search, can be described as volitional, it must be suppressed because, considering the totality of the circumstances, it was the product of the deputy’s constitutional violation. That conclusion also compels the conclusion that the resulting physical evidence must be suppressed. Both the consent and the physical evidence are the products of the same constitutional violation and, on these facts, defendant’s consent to search cannot serve to attenuate the taint of the Miranda violation and permit the admission of the physical evidence any more than did the voluntary, but unknowing, consents of the defendants in Vondehn and Jarnagin.
The only additional peg on which the majority hangs its hat is its characterization of the Miranda violation in this case as “not egregious.” 357 Or at 379. But why? This is not a case in which the trial court could make an unchallenged ruling — as did the trial court in Jarnagin— that the deputy failed to recognize that defendant was in compelling circumstances. Here, defendant was handcuffed when the interrogation began, and the deputy had to know that Miranda warnings were required. The majority does not contend otherwise, but nevertheless terms the deputy’s Miranda violation “not egregious,” implying that there may be different degrees of Miranda violations. Although there may be degrees of coercion, once coercion reaches the level at which Miranda warnings are required, an officer must provide the information that the constitution requires. When Miranda warnings are required, no adjectival description can render an officer’s constitutional violation meaningless.
Finally, returning to Unger, it is important to note that, in that case, the court cautioned that “consent that follows a random stop or seizure that lacks probable cause or *397 reasonable suspicion that a crime has been committed and that is nothing more than a fishing expedition for incriminating evidence” may be consent that is voluntary but nevertheless so tainted that suppression is required. 356 Or at 91. Here, although the deputy had probable cause to believe that defendant had been driving without a seatbelt, he did not have probable cause to believe that he was in possession of drugs. Nevertheless, the deputy handcuffed defendant and placed him in the back seat of the police car and went on a fishing expedition — deliberately interrogating defendant and seeking incriminating evidence without first warning defendant of his right to remain silent and to consult a lawyer. In Unger terms, defendant’s invitation to search may have been voluntary, but it was nevertheless so tainted that suppression is required.
I fear that the majority advances such police practices when it refuses to impose consequences for a deputy’s constitutional violation. And, on the other side of the coin, holding law enforcement officers accountable will not result in the long-term loss of evidence. If the majority is correct that, in circumstances like those in this case, detained individuals give consent to search not because they lack an understanding of their rights, but because they make a deliberate decision to waive those rights, then such individuals will give consent to search even if we require law enforcement officers to adhere to constitutional requirements.
In Unger, the court declined to impose a judicial consequence for the officers’ constitutional violation, expressing its expectations that officers will act within constitutional limitations. Id. at 94. Most law enforcement officers do act within constitutional limits and they do so most of the time. But when they do not, it benefits neither the officers nor our system of justice to excuse their violations by saying that they were “not egregious.” Our system of justice depends on the public’s respect for law enforcement. When officers do not obey the law, the public loses respect for law enforcement and the law — posing a danger to both. When we counsel, but do not demand, the best from law enforcement, we imperil both law enforcement and our system of justice.
*398 Judicially expressed expectations are not enough to secure liberty. “Liberty comes not from officials by grace but from the Constitution by right.” Maryland v. Wilson, 519 US 408, 424, 117 S Ct 882, 137 L Ed 2d 41 (1997) (Kennedy, J., dissenting). Because the majority retreats from principles necessary to give effect to those rights and to protect our system of laws and those who enforce them, I respectfully dissent.
Baldwin, J., joins in this dissenting opinion.