Argued and submitted October 15, 2019, affirmed December 9, on appellant's petition for reconsideration filed December 23, 2020, reconsideration allowed by opinion March 10, 2021
See 309 Or App 787, 482 P3d 821 (2021)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

HARRY CREIGHTON BEESON,
*Defendant-Appellant.*

Curry County Circuit Court
17CR12539; A166382

479 P3d 576

Defendant appeals a judgment of conviction for driving under the influence of intoxicants, ORS 813.010, and recklessly endangering another person, ORS 163.195. He assigns error to the trial court's denial of his motion to suppress evidence of his blood alcohol content (BAC), which an officer obtained after defendant submitted to a breath test. On appeal, defendant argues that admitting the BAC results violated his Article I, section 12, rights under the Oregon Constitution. In particular, he argues that his consent to the breath test was the product of an earlier *Miranda* violation. The state concedes the earlier violation but counters that it did not taint defendant's later decision to take the breath test. *Held*: The trial court did not err by denying defendant's motion to suppress. Given the totality of the circumstances, the *Miranda* violation did not taint defendant's decision to submit to the breath test. The admission of the BAC evidence therefore did not violate defendant's Article I, section 12, rights.

Affirmed.

Cynthia Lynnae Beaman, Judge.

Mark Kimbrell, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and Egan, Chief Judge, and Mooney, Judge.*

_____

* Egan, C. J., *vice* Hadlock, J. pro tempore.

MOONEY, J.

Affirmed.

**MOONEY, J.**

Police officers stopped defendant after it was reported that he had hit someone with his truck and that he was intoxicated. The state concedes that the officers violated defendant's state constitutional rights when, after the circumstances became compelling, they administered field sobriety tests (FSTs) to him and continued to ask him questions without advising him of his *Miranda* rights. The trial court suppressed the statements and FSTs but received into evidence the results of the blood-alcohol (BAC) test to which defendant consented after the violation. Defendant was convicted of driving under the influence of intoxicants, ORS 813.010, and recklessly endangering another person, ORS 163.195, after a bench trial. He assigns error to the trial court's denial of his motion to suppress the results of his breath test. Defendant argues that the *Miranda* violation tainted his consent to the breath alcohol test and that the results should, therefore, be suppressed. For the reasons we explain below, we conclude that the breath test was not the product of the *Miranda* violation and that the trial court did not err in denying the motion to suppress the test results. We affirm the judgment.

## I.   STANDARD OF REVIEW

We review the denial of defendant's motion to suppress for legal error. *State v. Heise-Fay*, 274 Or App 196, 201, 360 P3d 615 (2015). We are bound by the trial court's express and implicit factual findings, so long as evidence in the record supports them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *Id*. We state the facts consistently with our standard of review.

## II.   FACTUAL BACKGROUND

Defendant and T (the victim in this case) were familiar with each other on the day in question because they shared a remote family connection and because defendant's former girlfriend lived in a room in T's mother's home. While

T's mother was giving T a ride across town, T noticed defendant following them. They stopped and there was a brief exchange during which T told defendant to "please turn around. Please go home." When defendant did not respond, T said that he was going to call 9-1-1, which he immediately did. T walked back to his mother's car and, while he was providing 9-1-1 with a description of the vehicles, defendant "lunged his truck forward" striking T. T told the 9-1-1 operator that defendant "just hit me, he just hit me." After hitting T, defendant backed up, turned around, and drove away.

At approximately 5:00 p.m., Oregon State Police Trooper Katter heard the county dispatcher announce that there had just been a hit-and-run involving a potentially impaired driver. Katter began to search for the vehicle and, when she located it, activated her overhead lights and followed it. Defendant drove away from Katter, jumping the curb with his right rear tire as he turned onto Highway 101. He pulled into a nearby grocery store parking lot but did not immediately stop his vehicle. Katter then activated her siren, and defendant stopped circling and parked in front of the grocery store.

Defendant opened the door to his truck as Katter approached it. She smelled a "strong[] odor" of an alcoholic beverage emanating from defendant that remained strong throughout the contact. Katter noticed that defendant was "completely covered in mud" on his left side—from his "elbow down to his feet." His movements and speech were "sluggish," and his eyes were "glassy and bloodshot." When she asked to see his driver's license, defendant struggled for "about two and a half minutes to get it * * * out of his pants and hand it to" her. During this period of time, defendant and Katter had the following exchange:

"[KATTER]:   Well, sir, I can smell that you've been drinking. You're telling me that you haven't, but I can smell it. So how much have you had to drink today?

"[DEFENDANT]:   I don't drink.

"[KATTER]:   So are you on any medication?

"[DEFENDANT]:   Yes, ma'am. A lot of them.

"[KATTER]:   Okay. What—what kind of medication are you taking?

"[DEFENDANT]:   They're for my heart.

"[KATTER]:   Is it Atenolol?

"[DEFENDANT]:   There's a lot of medication."

At that point, defendant produced his driver's license and Katter asked him for insurance and registration. Their discussion continued:

"[KATTER]:   So if—so if you haven't had anything to drink but you're taking medications, what kind of medications are you on?

"[DEFENDANT]:   It's for my heart.

"[KATTER]:   Are you taking any pain medication?

"[DEFENDANT]:   No?

"[KATTER]:   No. Okay. All right. Well, just give me a few minutes. Sir, would you be willing to consent to some field sobriety tests?

"[DEFENDANT]:   Why?

"[KATTER]:   Why? Because I believe that you're impaired right now and shouldn't be driving, so I'd like—I'd like for you to be able to prove to me that you are indeed able to drive, so that's why I'm asking if you want to consent to field sobriety tests.

"[DEFENDANT]:   Well, I'd be more than happy to, but you've got to know I can't even put my underpants on in the morning, underpants.

"[KATTER]:   Well, then do you think you should be driving if you can't even put your underpants on? Can you be operating a motor vehicle on the highway? It's a reasonable question.

"[DEFENDANT]:   It probably is, yeah.

"[KATTER]:   So you'd be willing to consent to the tests? It's a simple yes or no.

"[DEFENDANT]:   Yes or no. I'd be more than happy to take your test.

"[KATTER]: Okay. Then just give me a few minutes, sir. I'm going to run this, and I'll be right back with you, and then we'll do those tests, okay? [Deputy Hanson is] going to hang out with you."

Deputy Hanson arrived while defendant was working to retrieve his driver's license. Hanson opened the passenger-side door of the truck and asked, "How are you?," to which defendant responded, "Good. How are you?" Katter continued with defendant:

"[KATTER]: Did you fall down in the mud? It looks like you—

"[DEFENDANT]: No. I was picking flowers for my girlfriend.

"[KATTER]: You were picking flowers?

"[DEFENDANT]: Yeah.

"[KATTER]: That's—it looks like muddy work.

"[DEFENDANT]: No, I did, too. I can take you back to show them to you."

Katter then asked defendant for his car keys, and, when defendant asked why, Katter told him, "[b]ecause you're not going anywhere."

T arrived on the scene shortly thereafter, and defendant exited his truck in an effort to confront him. A third officer, Hodencamp, also arrived on the scene at that time. Hanson told defendant to return to his truck, but, when defendant did not comply, Hanson physically restrained defendant and instructed him to place his arms behind his back until he could calm back down. Katter told defendant to "relax," and defendant returned to his truck without further restraints. She asked him whether he was ready to take field sobriety tests (FSTs), and he responded that he was—after first denying that he had consumed alcohol and telling her again that he was taking medication. Defendant performed the requested FSTs, after which Katter told Hodencamp that she was going to arrest defendant for driving under the influence of intoxicants (DUII).

Hodencamp then began asking defendant questions related to the hit-and-run without providing defendant with *Miranda* warnings. After several minutes of questioning, Hodencamp and defendant had the following exchange:

"[HODENCAMP]: Alright. Is there anything else that you want to tell me right now that you can think of? Anything that would make it easier for you? Help you out?

"[DEFENDANT]: I got nothing else to say.

"[HODENCAMP]: OK. We're all done."

[Defendant starts to say something]

"[HODENCAMP]: OK. I'm going to stop you right there. I'm going to read you your rights, OK.

"[HODENCAMP, speaking to Katter]: Have you read him his rights yet?

"[KATTER]: Not yet.

"[HODENCAMP]: I'm going to read you your rights real quick, OK?

"[DEFENDANT]: I'm getting arrested for this drug addict, mother fucker—

"[HODENCAMP]: OK, listen up now. You told me that you don't want to say nothing else, so I'm going to stop you there, and I'm going to read you your rights, OK."

Hodencamp then read defendant the *Miranda* warnings, after which the exchange continued:

"[HODENCAMP]: Do you understand those rights?

"[DEFENDANT]: Yes sir.

"[HODENCAMP]: Alright. You are under arrest for DUII, and there might be additional charges."

Hodencamp arrested defendant at 5:25 p.m., approximately 30 minutes after Katter initially responded to the report from dispatch. Hodencamp drove defendant to the police station, where Katter resumed her DUII investigation. Katter read defendant his rights related to implied consent, after which defendant signed the implied consent

form. Katter observed defendant for the required 15 minutes, at which point she administered the breath test, which yielded a blood-alcohol content (BAC) of .21 percent.

## III.   PROCEDURAL HISTORY

Defendant filed a pretrial motion to suppress, seeking to exclude evidence of statements he had made to the police, police observations of defendant, physical evidence, breath test results, and "all evidence, the source of which, comes from any contact with [defendant] either at the vehicle or thereafter by any police officer *** or [I]ntoxilyzer testing." Defendant argued that his rights under the Fifth Amendment of the United States Constitution and Article I, section 12, of the Oregon Constitution had been violated because he was questioned without first being advised of his *Miranda* rights at a time when he was in "constructive custody." Constructive custody, he argued, arose at the point when "all three officers were directing him what to do and where to go and prevented him from moving freely." Defendant further argued that, although Hodencamp advised him of his *Miranda* rights at the time of his formal arrest, and before his submission to the breath test, his consent to take the breath test was tainted by the earlier *Miranda* violation. Thus, defendant argued that the breath test evidence should be suppressed as well.

The state conceded that there were compelling circumstances requiring *Miranda* warnings once Katter and Hanson went "hands-on" with defendant in order to stop him from confronting the victim of the hit and run. The state therefore agreed that defendant's statements after that point and the results of the FSTs should be suppressed, but it opposed the suppression of the breath test evidence, arguing that, under *State v. Chambers*, 147 Or App 626, 938 P2d 793 (1997), *rev den*, 327 Or 82 (1998), the *Miranda* violation did not taint defendant's subsequent consent to the breath test. It specifically argued that defendant's consent was not causally related to the *Miranda* violation because (1) the officers could have arrested defendant for DUII without first conducting FSTs (*i.e.*, they had probable cause for DUII without the FSTs and without defendant's unwarned

statements), (2) he was advised of his rights when he was arrested, and (3) his subsequent consent to the breath test was voluntary under ORS 813.100.[1]

Alternatively, the state argued that intervening events dissipated the taint of the *Miranda* violation, rendering the consent voluntary and the resulting test results admissible. Defendant responded that, because the *Miranda* violation was so close in time to the breath test, the test result should be excluded as a product of the *Miranda* violation, along with his statements and his performance on the FSTs. And, again, the state agreed that the FST evidence and pre-*Miranda* statements were not admissible.

The trial court accepted the state's concession and, accordingly, granted the motion to suppress defendant's post-violation statements and the FST results, but it denied defendant's motion to the extent it sought to suppress the breath test results. The court found, among other things, that Katter had probable cause to arrest defendant for DUII upon her initial contact with him in the parking lot, that defendant provided consent to take FSTs "prior to any compelling circumstances," that defendant himself created the "compelling circumstances" by exiting his vehicle to confront the victim, and that the officers' reaction to defendant's "attempt to confront the victim in an aggressive manner" was "reasonable." It agreed with each of the state's alternative grounds for admitting the breath test results—the "independent source doctrine"[2] and the "attenuation doctrine"[3]—finding that

---

[1] ORS 813.100 provides that "[a]ny person who operates a motor vehicle upon premises open to the public or the highways of this state shall be deemed to have given consent, subject to the implied consent law, to a chemical test of the person's breath," and that the consequences of refusing to do so includes the suspension of driving privileges.

[2] "The independent source doctrine permits the introduction of evidence initially discovered during, or as a consequence of," unlawful state activity, "but later obtained independently from activities untainted by the initial illegality." *State v. Johnson*, 335 Or 511, 519, 73 P3d 282 (2003) (internal quotation marks and citations omitted).

[3] The attenuation doctrine permits the introduction of evidence obtained after illegal state activity, so long as the state can prove that it obtained the evidence after the taint of the illegality had dissipated, demonstrating that the evidence was not derived from the illegality. *State v. Delong*, 357 Or 365, 380-81, 350 P3d 433 (2015).

"[i]t was a relatively short period of time between [Katter's] encounter with the defendant in the *** parking lot *** and at the jail. However, there were some things that occurred prior to the breath test and in between the compelling circumstances and the lack of *Miranda* warnings and the time the breath test was provided, those things including the defendant being taken to another location, so it was not the same location. It included that his *Miranda* warnings—or the *Miranda* warnings were provided to him, and it included reading the Implied Consent Form [pursuant to ORS 813.100].

"The court will find that if the defendant had not agreed to take the field sobriety tests, the trooper would have taken—would have arrested him and taken him to the jail to go through the Implied Consent Form and to request that he take a breath test. The court will conclude that the test—the State would have requested the breath test regardless of the *Miranda* violation.

"Furthermore, the court will find that under the totality of the circumstances the State did not exploit any unlawful interrogation or violation of *Miranda* warning rights in order to obtain the breath test, so the defense's position fails on both the but for tests and then under totality of the circumstances and with a view towards the nature of the causal connection between the violation of rights and the later obtained breath test.

"*****

"The breath test evidence doesn't derive from any unlawful activity from the State."

Defendant waived his right to a trial by jury. During his bench trial, among other things, the state introduced evidence of defendant's BAC. The court found defendant guilty on two counts—DUII, ORS 813.010, and recklessly endangering another person—ORS 163.195, but acquitted him of reckless driving, ORS 811.140, and entered a judgment accordingly. Defendant now appeals that judgment, assigning error to the trial court's denial of his motion to suppress.

## IV.   ANALYSIS

On appeal, defendant limits his argument to the court's refusal to suppress the evidence of the results of

his breath test under Article I, section 12. He argues that there are two related reasons why the breath test results should have been suppressed. First, he argues that he was in "constructive custody" earlier in the encounter than the point at which the state conceded that a *Miranda* violation occurred (*i.e.*, the point at which the officers went "hands on" with defendant). Because the police did not supply *Miranda* warnings at that earlier point, he argues, the "police-dominated" atmosphere, combined with the lack of *Miranda* warnings, rendered his consent to the breath test involuntary. Second, and relatedly, he argues that, although the officers provided belated *Miranda* warnings, the state failed to demonstrate that those warnings dissipated the taint of the earlier *Miranda* violation, also rendering his consent to take the breath test an involuntary product of the violation.

Before turning directly to the question presented, we must address a preliminary issue. The state argues that defendant invited error with regard to his first argument— that the police-dominated atmosphere required the provision of *Miranda* warnings earlier in the encounter than the state concedes. *See State v. Kammeyer*, 226 Or App 210, 214, 203 P3d 274, *rev den*, 346 Or 590 (2009) ("Under the invited error doctrine, a party who 'was actively instrumental in bringing about' an alleged error 'cannot be heard to complain, and the case ought not to be reversed because of it.'" (Quoting *Anderson v. Oregon Railroad Co.*, 45 Or 211, 216-17, 77 P 119 (1904).)).

As the state observes, defendant did not argue before the trial court that he was in constructive custody any earlier than the time at which the state conceded that a *Miranda* violation occurred. Rather, in his motion to suppress, he argued that circumstances became "compelling" when "all three officers were directing him what to do and where to go and prevented him from moving freely in any manner including taking steps to physically touch the Defendant and direct him to places they wanted him to go." Defendant argued that "[t]he violation then is during the field sobriety test, which is just before the arrest[.]" Thus, whether or not defendant *invited* any error regarding the

timing of the *Miranda* violation, he certainly did not preserve an argument that he was in constructive custody before the encounter became "hands on." Accordingly, we will not consider that argument on appeal. *See* ORAP 5.45(1); *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted."). Therefore, for our purposes, defendant was in custody when the state concedes that he was—when the officers went "hands on" with him. *Miranda* warnings were required at that point.

We turn now to the question presented: whether defendant's consent to submit to the breath test was the product of that *Miranda* violation. We must determine whether the consent to the breath test "*derived* from [the officers'] violation of defendant's Article I, section 12, rights." *State v. Taylor*, 296 Or App 278, 285, 438 P3d 419 (2019) (emphasis added). That determination "cannot be reduced to a mechanical formula." *State v. Swan*, 363 Or 121, 131, 420 P3d 9 (2018). It instead requires a totality-of-the-circumstances analysis, and the state bears the burden to prove that defendant's consent "broke the causal chain between the prior Article I, section 12, violation and his breath test results." *Id.* Among other things, the fact-specific analysis may include consideration of

> "the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements."

*State v. Jarnagin*, 351 Or 703, 716, 277 P3d 535 (2012).

In *Jarnagin*, officers began investigating the defendant after his child was admitted to the hospital with injuries consistent with possible abuse. During the course of the investigation, officers spoke with the defendant at the hospital and at the police station, where he provided an explanation for how his child was injured. *Id.* at 706-08. The next

day, the police went to the defendant's home, where he reenacted for them the same version of events that he had recited at the police station the day before. *Id.* at 710. After that, he agreed to accompany them to another police station to take a polygraph examination. He went to the station two to three hours later, where he was advised of his *Miranda* rights for the first time. He then submitted to the polygraph examination, during which he changed his explanation of how his child was injured. *Id.* at 711-13. The defendant was charged with a number of crimes, including murder by abuse. He moved to suppress the statements he made over the course of the two-day investigation, arguing that, because he had not been given *Miranda* warnings until the time of the polygraph examination, all of his statements—made before and after he was *Mirandized*—were inadmissible. *Id.* at 713. The trial court granted the defendant's motion to suppress as to all but a few statements made just prior to administration of the polygraph examination. *Id.*

On review, the Supreme Court first concluded that, because circumstances were "compelling" both at the hospital and at the police station, *Miranda* warnings were required before the officers spoke with the defendant at those locations. *Id.* at 719. And, because "the video reenactment was a product of the *Miranda* violation the day before," the court also concluded that the defendant's statements at his home were properly suppressed. *Id.* The court concluded, however, that the officers' post-violation *Miranda* warnings effectively dissipated the taint of the earlier violations and allowed for the admission into evidence of statements made during the polygraph examination. *Id.* at 722.

Comparing *Missouri v. Seibert*, 542 US 600, 124 S Ct 2601, 159 L Ed 2d 643 (2004), to *Oregon v. Elstad*, 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985),[4] the *Jarnagin*

---

[4] In *Elstad*, the officers arrested the defendant in his house, but, before providing him with *Miranda* warnings, asked whether he was involved in a burglary. 470 US at 300-01. The defendant admitted to being present at the burglary, after which the officers took him to the police station and *Mirandized* him. After that, he agreed to speak with the officers and provided a full statement admitting that he was involved in the burglary. *Id.* at 301. The Supreme Court held that the late *Miranda* warnings were sufficient to ensure that the defendant adequately waived his Fifth Amendment rights because the officers' lack of "coercion" indicated that the defendant's waiver was voluntary. *Id.* at 313-15.

court reiterated its adoption of the *Seibert* plurality opinion in an earlier case:

> "'The problem that *Seibert* demonstrates *** is that when the police question first and warn later, their exhibition and exercise of authority and violation of the defendant's constitutional rights may communicate to a defendant, as the Court believed they did in that case, that, before the defendant will be released, he or she must answer the questions asked. In that circumstance, the police not only fail to provide the defendant with the information necessary to a valid waiver—that the defendant has a right to remain silent and to confer with an attorney—the police also convey a contrary message. In that situation, when the police later administer *Miranda* warnings, we cannot assume that the mere recitation of *Miranda* warnings is sufficient to serve the intended informative function.

> "'That being said, we note that *Seibert* is at one end of the range of the factual circumstances that present the issue that we address. [*Elstad*] is at the other. Not every instance in which the police question first and warn later communicates a mixed message.'"

*Jarnagin*, 351 Or at 720 (quoting *State v. Vondehn*, 348 Or 462, 481, 236 P3d 691 (2010) (alteration added)). The court distinguished the case before it from *Seibert* and concluded that "[t]he polygraph examination that occasioned defendant's waiver of his *Miranda* rights presented 'a markedly different experience' from the officers' questioning the day before and the video reenactment earlier that day." *Id.* at 723 (citing *Seibert*, 542 US at 615). The court held that the post-violation *Miranda* warnings were effective at dissipating the taint of the earlier, nonflagrant violation with respect to the defendant's consent to take the polygraph examination. *Id.*

The court reached a different conclusion in *Swan*. There, the defendant performed poorly on FSTs, was arrested for DUII, and was taken to the police station. 363 Or at 126. After being advised of his *Miranda* rights, the defendant asked to speak with his lawyer, with whom he then spoke at length from a jail cell. After that, the officer asked the defendant nearly 30 questions from an implied consent form, read him his rights concerning implied consent, and

requested a breath test. The defendant initially declined to consent to the breath test, again invoking his right to counsel, but later acquiesced to the breath test, which returned a .18 percent BAC. *Id.* The defendant moved unsuccessfully to suppress the answers to the questions as well as the breath test results, and he was convicted of DUII. *Id.* at 127. The state conceded that the answers to the interview questions should have been suppressed but argued that the breath test results did not derive from the impermissible questions and were, therefore, properly admitted into evidence. *Id.* The Supreme Court ultimately concluded that the defendant's consent to the breath test was the product of "flagrant and repeated" *Miranda* violations. The defendant's "decision to take the breath test was the product of the immediately preceding *Miranda* violation" because "no time elapsed between the questions that [the officer] asked in violation of defendant's right to counsel and his question whether defendant would take a breath test," and because the "defendant remained in custody throughout that time." *Id.* at 131-32.

Whether the violation of defendant's Article I, section 12, rights in this case tainted his consent to the breath test is a close call. On the one hand, defendant remained in custody from the time of the violation through the time of the breath test over a time period lasting less than an hour, tending to favor suppression. On the other hand, the violation and breath tests occurred in different locations, defendant was advised of his rights before he consented to the breath test, and the violation itself was not flagrant, tending to disfavor suppression. As we explain below, the record supports the trial court's determination that defendant's consent to the breath alcohol test was not tainted by the *Miranda* violation and, therefore, we conclude that the court did not err in denying defendant's motion to suppress the results of that test.

A.   *Whether Defendant Remained in Custody Before Making Any Later Statements*

Defendant was placed in custody shortly after the circumstances became compelling, and he remained in custody

until he submitted to the breath test. Because there was no break in custody between the officer's *Miranda* violation and defendant's consent to take the breath test, this weighs in favor of suppression. *See id.* at 132 ("[T]here was no break in * * * custody between the officer's repeated Article I, section 12, violation and defendant's decision to take the breath test that might have attenuated the effect of the violation."); *State v. Koch*, 267 Or App 322, 333, 341 P3d 112 (2014) (concluding that "the circumstances * * * militate * * * in favor of suppression" because the "defendant was under compelling circumstances within 15 minutes of the initial encounter and was under arrest when he gave the urine sample"); *Taylor*, 296 Or App at 292 ("Because defendant was under compelling circumstances within 20 minutes of the initial encounter when she was placed under arrest, and there was no break in custody before [the officer] asked defendant to take a breath test, the third *Jarnagin* factor also militates in favor of suppression.").

B.  *Amount of Time Between the Violation and the Breath Test*

Approximately 35 to 40 minutes elapsed between the *Miranda* violation and defendant's consent to take the breath test. The short time frame, involving no real break, also weighs in favor of suppression. *See Swan*, 363 Or at 132 (concluding that "the prior illegality and the defendant's decision to take the breath test blended into a continuum" because "there was no break in time, place, or custody between the officer's repeated Article I, section 12, violation and defendant's decision to take the breath test that might have attenuated the effect of the violation" (internal quotation marks and citation omitted)); *State v. McAnulty*, 356 Or 432, 458, 338 P3d 653 (2014) (suppressing statements obtained "immediately after" a *Miranda* violation); *Taylor*, 296 Or at 291 (concluding that a breath test taken 15 minutes after a *Miranda* violation suggested that the defendant's decision to submit to the test was tainted by the *Miranda* violation). *But see State v. Ward*, 367 Or 188, 205, 475 P3d 420 (2020) ("[A] short delay and change of location, alone, will generally not preclude the state from proving a valid waiver.").

C.   *Nature of the Violation*

The conceded *Miranda* violation in the case before us, unlike the violation in *Swan*, was not egregious or flagrant. Here, the officers did not disregard defendant's invocation of his constitutional rights. They did not ask him multiple questions in the face of repeated requests for counsel. *See Koch*, 267 Or App at 332 (concluding that the violation was "flagrant" where the officer subjected the defendant to custodial interrogation by "repeatedly" questioning him after he had invoked his right to counsel). The violation here occurred when the officers administered FSTs to defendant for about 15 minutes and asked him questions related to the hit-and-run without first advising him of his *Miranda* rights. The context immediately preceding the violation was at least confusing, if not momentarily chaotic, given that the victim had arrived on the scene, apparently triggering defendant's unexpected jump from his truck and his attempt to confront the victim. The officers reacted quickly to restrain defendant, but handcuffs were not used, and the officers and defendant remained fairly relaxed. As the state concedes, the circumstances became compelling at that point and the officers should have advised defendant of his rights before proceeding. This was not, however, an intentional or flagrant violation. Instead, it appears that the officers did not immediately recognize that the encounter had reached a constitutionally significant point.

We are mindful that the Supreme Court recently cautioned us to limit our conclusion that a *Miranda* violation is "not especially flagrant," suggesting such a finding "should be limited to violations that consist of 'the officers fail[ing] to recognize that the circumstances had become sufficiently compelling to require Miranda warnings.'" *Ward*, 367 Or at 201 n 9 (quoting *Swan*, 363 Or at 133 (alterations in *Ward*)). The court's conclusion in *Ward* reinforces the trial court's finding, here, that the violation was neither flagrant nor egregious because the officers simply failed to recognize that the situation had become compelling. They did not deliberately violate defendant's rights. The nature of the violation here was not egregious, weighing against suppression.

D.  *Subsequent Events that May Have Dissipated the Taint
    of the Earlier Violation*

Three significant events occurred between the
*Miranda* violation and the consent for breath test that
weigh against suppression: (1) Hodencamp read defendant
his *Miranda* rights and, while doing so, prevented defendant
from interrupting so that he could finish the *Miranda* warn-
ings and obtain defendant's acknowledgment that he under-
stood the warnings; (2) the officers transported defendant
to another location, the police station; and (3) Katter read
defendant the implied consent form, which includes rights
and consequences, before he consented to the breath alcohol
test. Katter testified that she read the form to defendant
and followed all of the procedures required, and she did so
after contacting Hodencamp to confirm that he had advised
defendant of his *Miranda* rights.

That Hodencamp read defendant his *Miranda*
rights is important in our analysis. The court in *Jarnagin*
found that an officer's belated *Miranda* warnings were
"effective to purge the taint of the prior violation and ensure
a knowing and voluntary waiver of defendant's right[s]."
*Jarnagin*, 351 Or at 724. Thus, belated *Miranda* warnings,
in certain contexts, can effectively cure an earlier violation.
Such later warnings are generally not sufficient to dissipate
the taint of the earlier violation when "the unwarned inter-
rogation left 'little, if anything, of incriminating potential
*** unsaid,' making it 'unnatural' not to 'repeat at the sec-
ond stage [of the interrogation] what had been said before.'"
*Id.* at 722 (quoting *Seibert*, 542 US at 616-17 (alterations in
original)). In other words, late *Miranda* warnings do not
effectively dissipate the taint of an earlier violation when
officers "communicate[] a mixed message" to the defendant
by "question[ing] first and warn[ing] later." *Vondehn*, 348 Or
at 481. That is because the defendant would feel pressured
to repeat what he or she had said during the unwarned
interrogation. *Seibert*, 542 US at 617.

Here, the post-violation events illustrate an even
cleaner break in the investigation than occurred in *Jarnagin*.
Unlike the defendant in *Jarnagin*, who was taken to the
police station for a long polygraph examination after two

days of off-and-on questioning, the defendant here was taken to the police station and subjected to a single breath test. As the court stated in *Jarnagin*, this is "not a case, as in *Seibert*, where the unwarned interrogation left 'little, if anything, of incriminating potential *** unsaid,' making it 'unnatural' not to 'repeat at the second stage [of the interrogation] what had been said before.'" 351 Or at 722 (quoting *Seibert*, 542 US at 616-17 (alterations in original)). And "unlike in *Seibert*, there is no concern here that police gave [defendant] *Miranda* warnings and then led him to repeat an earlier *** confession, *because there was no earlier confession to repeat.*" *Bobby v. Dixon*, 565 US 23, 31, 132 S Ct 26, 181 L Ed 2d 328 (2011) (emphasis added). Instead, Hodencamp's pre-*Miranda* questions about the hit-and-run were limited to the facts of the hit-and-run. And, defendant consistently denied alcohol consumption throughout the investigation, including after the FSTs. He maintained that his behavior was due to a medical condition and his related medications—not alcohol consumption.

Defendant argues that the belated *Miranda* warnings did not dissipate the taint of the violation because "the officers' behavior immediately leading to their administration of *Miranda* warnings communicated to defendant that, despite the contents of the warnings *** the police could question him at will and seek his consent to perform tests that illuminated his intoxication, as they had already done." We disagree for two reasons. First, because defendant consented to the FSTs before the *Miranda* violation occurred, that consent was not connected to the subsequent violation. Moreover, defendant continued to deny that he had been drinking. That tends to detract from the argument that he later consented to the breath test because he perceived that, given the violation and subsequent conduct of the officers, withholding consent would be futile.

Second, Hodencamp did not permit defendant to interrupt or make any statements while he read him his *Miranda* rights. The officers did not "question first and warn later," and they did not communicate that, "before the defendant will be released, he *** must answer the questions asked." *Vondehn*, 348 Or at 481. The police already

had probable cause to arrest defendant for DUII before the *Miranda* violation. They learned almost no new information between the time of the violation and the giving of the *Miranda* warnings, and Hodencamp clearly communicated to defendant that he had the right to remain silent and that he should, in fact, exercise it. The officers' conduct did not diminish the importance of the *Miranda* warnings. The manner in which defendant was advised of his rights highlighted the importance of those rights. *See Jarnagin*, 351 Or at 723-25 (highlighting the importance of an officer's explanation of *Miranda* warnings in the totality of the circumstances analysis).

Defendant also argues that the *Miranda* warnings were ineffective because the pre-*Miranda* FSTs and inquiry, together with defendant's post-*Miranda* consent to a breath test, created "a continuous and fluid police operation." *Heise-Fay*, 274 Or App at 212. It is true that merely providing *Miranda* warnings is not sufficient alone to cure a *Miranda* violation. Post-violation warnings are generally ineffective when they are a mere formality that blends two phases of questioning into a "continuum." *See id.* (concluding that questioning blended into a "continuum," rendering the post-*Miranda* statements inadmissible, when one officer asked the defendant "detailed and probing questions" over a relatively short period of time before finally providing *Miranda* warnings). Here, however, the officers' pre- and post-*Miranda* conduct did not blend into one "continuum." Again, the officers did not ask defendant a series of detailed questions before or after the *Miranda* warnings. And the context in which defendant consented to the breath test was a "markedly different experience" from the one in which he performed FSTs in the parking lot and responded to questions limited to the hit and run. *See Elstad*, 470 US at 315. Despite the short period of time in which the entire interaction occurred, there was a clear change of circumstances that provided a break in the investigation sufficient to remove the taint of the violation that occurred in the field from the consent to breath test that occurred later at the station. *See Swan*, 363 Or at 132 (highlighting the importance of a "break in time, *place*, [and] custody" in the *Jarnagin* analysis (emphasis added)).

E.   *The State's Use of the Unwarned Statements*

Finally, the record indicates that the state did not use defendant's post-violation statements to induce him to submit to the breath test. That also weighs against suppression. Unlike in *State v. Mast*, 301 Or App 809, 823, 459 P3d 938 (2020), where the defendant's *admissions* "left little of incriminating potential unsaid" beyond the defendant's BAC, defendant here made no post-violation statements that would render it futile to refuse to consent to the breath test. Rather, he maintained that he was impaired because of his medical conditions and medications and he believed that he was being arrested because the victim accused him of a crime. He never admitted to drinking. Moreover, the record demonstrates that his statements after the *Miranda* violation were largely duplicative of the statements he made before the violation. Defendant did not make admissions which "'were inextricably intertwined with [Katter's] seeking, and obtaining,' the breath test results."[5] *Taylor*, 296 Or App at 295-96 (quoting *Koch*, 267 Or App at 334).

The totality of the circumstances reflected in the record demonstrates that defendant's decision to consent to the breath alcohol test was not a product of the *Miranda* violation. The trial court did not err in denying defendant's motion to suppress the breath alcohol test results.

Affirmed.

---

[5] Defendant also argues that, notwithstanding his lack of an admission, the state "failed to make a sufficient record" of Hodencamp's conversation with defendant just prior to his reading of the *Miranda* warnings. Although a small portion of the audio of his conversation with Hodencamp is absent from the record, the audible portions strongly suggest that Hodencamp restricted his investigation to the hit-and-run and that he did not participate in the DUII investigation. And, again, defendant believed that he was being arrested because the victim accused him of striking him with his car. Those facts create a plausible inference that the state did not make use of any of the information Hodencamp learned to pressure him into taking a breath test. *See Ehly*, 317 Or at 75 (we presume that a trial court made findings consistent with its decision, so long as evidence in the record would support those findings).