318 May 7, 2025 No. 400

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LARRY DALE NORTHEY,
*Defendant-Appellant.*

Harney County Circuit Court
21CR50829; A181691

Robert S. Raschio, Judge.

Submitted April 2, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Sarah De La Cruz, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jordan R. Silk, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

AOYAGI, P. J.

Affirmed.

## AOYAGI, P. J.

Defendant appeals a judgment of conviction for two counts of pointing a firearm at another. Those convictions relate to an incident that began with defendant's wife, P, ramming her vehicle into a camp trailer occupied by defendant and L, and that ended with defendant firing shots in the direction of his wife and their adult granddaughter, K. Defendant claims that the trial court erred by (1) denying his motion to suppress statements that he made to the sheriff after receiving belated *Miranda* warnings, and (2) denying his motion for a mistrial based on a spontaneous statement that P made while testifying at trial. For the following reasons, we affirm.

## MOTION TO SUPPRESS

Suspecting defendant of cheating on her, P went to a remote campsite to confront him. A chaotic incident ensued. That incident ended with defendant firing his gun toward P and K, and their fleeing the scene. The sheriff and four other law enforcement officers were called to respond. They contacted P and K on the road that led to the campsite, blocked the road, spoke with P and K, and watched a cellphone video recorded by K. When L drove down the road about 15 to 20 minutes after the initial contact with P and K, they stopped L and spoke with her. Within 10 minutes after that, defendant came down the road in his truck. He was ordered out of the truck at gunpoint, frisked, and handcuffed. Defendant was asked some initial questions about the truck and weapons, which led to his revealing that there was a gun in the center console. Defendant indicated that he knew why they were there. The sheriff asked him what had happened. Defendant gave a brief summary of his version of events, including answering a few clarifying questions, which took 80 seconds. In substance, defendant stated that he had been hanging out with L, whom he had known for about a year, and with whom there was nothing sexual going on; that L's boyfriend was supposed to meet them at the campsite but had not shown up; that a car rammed into the trailer while they were inside; that P started throwing things and cussing and got into defendant's truck; that defendant threw a plastic pop bottle at P, which hit her; that

P got in her car and "damn near" ran him over, so he tried to shoot at the tire; and that he did not shoot at P.

At that point, the sheriff stopped, said that he was "kind of skipping a step here," as they were "obviously trying to figure out what's going on," and told defendant that he was going to read him his *Miranda* rights. The sheriff read defendant his *Miranda* rights and asked if he understood his rights. Defendant answered, "Yeah. I'm just trying to tell you guys what was going on." The sheriff asked, "Okay, you still want to keep talking to us with your rights in mind?" Defendant answered, "Oh, yeah. I mean, I don't got nothing to hide from you all."

The sheriff began asking questions. His tone remained polite and nonconfrontational. Over the course of 18 minutes, defendant described the entire incident in great detail, both in terms of what happened and what he was thinking as it happened, as well as describing the exact location of the campsite and discussing his relationship with P, P's history of violence, his own physical condition, and his alcohol consumption that evening. Defendant was very cooperative, appeared relaxed, and intermittently joked with the sheriff. The sheriff did not make any accusations against defendant. He repeatedly expressed concern for defendant's physical comfort and, early on, changed how defendant was handcuffed to make him more comfortable. Defendant's post-*Miranda* statements were consistent with his pre-*Miranda* statements but much more detailed. For example, he again described throwing a pop bottle at P, but he explained that he did so because she came at him with a stick and that the bottle was a large plastic jug with a few inches of pop in it. As for shooting at P's car, he again said that he had shot at the tire because P was trying to run him over, noted that the police always say to shoot at the tire, and admitted that he shot twice and that one of the shots might have hit near the rear door. Defendant never expressly admitted to any wrongdoing in either his pre- or post-*Miranda* statements. He did generally apologize for the situation during his post-*Miranda* statements, to which the sheriff responded that it was their job.

Defendant was subsequently charged with unlawful use of a weapon (UUW), ORS 166.220; two counts of

pointing a firearm at another, ORS 166.190; two counts of recklessly endangering another person, ORS 163.195, with one alleged to have constituted domestic violence; and two counts of harassment, ORS 166.065. Before trial, he filed a motion to suppress. The trial court granted the motion in part, suppressing defendant's pre-*Miranda* statements and the gun from the center console, but it denied the motion as to defendant's post-*Miranda* statements. Defendant assigns error to the latter aspect of the court's ruling.

Under Article I, section 12, of the Oregon Constitution, a person in custody or compelling circumstances must be given *Miranda*-like warnings to ensure that any waiver of their constitutional rights is knowing and voluntary. *State v. Vondehn*, 348 Or 462, 480, 236 P3d 691 (2010). If a defendant in custody or compelling circumstances is subjected to unwarned interrogation, then given belated *Miranda* warnings, after which the interrogation continues, the person's post-*Miranda* statements are subject to suppression unless the state establishes that, under the totality of the circumstances, the warnings were "effective" and accomplished their intended informative purpose. *Id*. at 467 ("[A] trial court must exclude defendant's warned post-*Miranda* statements unless the state establishes that, considering the totality of the circumstances, when the police belatedly administer[ed] *Miranda* warnings, they effectively and accurately informed the defendant of his or her Article I, section 12, rights."); *id*. at 480-81 (discussing the intended purpose of *Miranda* warnings as relevant to the effectiveness of belated warnings).

Here, defendant argues that the belated *Miranda* warnings were not effective and that his post-*Miranda* statements should have been suppressed. The state maintains that the trial court did not err by denying suppression of the post-*Miranda* statements. Reviewing for legal error, *State v. Beeson*, 307 Or App 808, 810, 479 P3d 576 (2020), *adh'd to as modified on recons*, 309 Or App 787, 482 P3d 821 (2021), we agree with the state.

As a preliminary matter, we recognize that the correct test to apply in this scenario is the *Vondehn* test for statements made after belated *Miranda* warnings, rather

than the *Jarnagin* test for evidence derived from the failure to give *Miranda* warnings.

When a person is questioned while in custody or compelling circumstances without being advised of their rights, their direct responses must be suppressed. *State v. Jarnagin*, 351 Or 703, 713, 277 P3d 535 (2012). Any evidence derived from the violation also must be suppressed: "[B]ecause the failure to give *Miranda* warnings, when required, is itself a constitutional violation, the remedy for that violation extends not only to a defendant's unwarned responses to an officer's questions but also to the physical and testimonial evidence that is the product of that violation." *Id*. at 716. Thus, for example, in *Jarnagin*, the defendant moved to suppress statements that he made while participating in a video reenactment at a time when he was not in custody or compelling circumstances, on the theory that those statements "derived from [a] *Miranda* violation the day before." *Id*. at 716 n 8. Under *Jarnagin*, a court looks to the totality of the circumstances to determine what evidence was derived from an earlier *Miranda* violation, such that it must be suppressed as fruit of the poisonous tree, and *Jarnagin* provides a nonexclusive list of factors to consider. *Id*. at 716-17. For ease of reference, we refer to that standard as the *Jarnagin* test and the *Jarnagin* factors.

By contrast, when a person in custody or compelling circumstances is given belated *Miranda* warnings in the course of an interrogation, it is the *Vondehn* test that applies in determining whether any post-*Miranda* statements should be suppressed. *State v. Delong,* 357 Or 365, 373, 350 P3d 433 (2015) ("The statements that the court held admissible in *Vondehn* followed belated *Miranda* warnings, and the test that the court articulated (whether the belated warnings were effective) applies in that circumstance."); *Jarnagin*, 351 Or at 716 n 8 (the *Vondehn* test applies "when a defendant remains in custody and officers seek to remedy an earlier *Miranda* violation"). Under *Vondehn*, a court looks to the totality of the circumstances to determine whether the belated *Miranda* warnings were effective, such that subsequent statements reflect a knowing and voluntary waiver of rights, and *Vondehn* provides a nonexclusive list of factors

to consider. 348 Or at 467, 479, 485. For ease of reference, we refer to that standard as the *Vondehn* test and the *Vondehn* factors.[1]

Despite their similarities—both standards pertain to suppression, both require a totality-of-the-circumstances analysis, and there is some similarity between the two sets of factors—*Vondehn* and *Jarnagin* apply to different situations and provide for different inquiries. The *Jarnagin* analysis has to do with derivation and attenuation and is thus grounded in the fruit-of-the-poisonous-tree doctrine. *See Delong*, 357 Or at 370 n 7 (describing that doctrine). By contrast, the *Vondehn* test is "not seeking to determine whether the defendant's warned statements were the fruit of the poisonous tree" but, instead, "whether the belated *Miranda* warnings were effective in ensuring that the defendant's decision to waive his right against self-incrimination was knowing and voluntary." *Id.* at 373; *see also Jarnagin*, 351 Or at 716 n 8 (noting that *Vondehn* sets forth "a different calculus" from *Jarnagin*); *State v. Mast*, 301 Or App 809, 820 n 2, 459 P3d 938 (2020) ("Although applying some similar factors, the analysis set forth in *Jarnagin* differs from the analysis in *Vondehn*[.]").[2]

In this case, defendant moved to suppress his pre-*Miranda* statements, the gun from his truck, and his post-*Miranda* statements. Properly framed, the suppression of the gun is a *Jarnagin* issue (whether that evidence was derived from the *Miranda* violation, such that it was fruit

---

[1] We note that *Jarnagin* actually involved three different suppression issues subject to three different standards, as succinctly acknowledged in footnote 8 of that opinion. 351 Or at 716 n 8. Unwarned statements that the defendant made while in compelling circumstances on July 7 were suppressed based on the direct violation of Article I, section 12. *Id.* at 714. Evidence from a video reenactment in which the defendant participated on July 8, while not in custody or compelling circumstances, was suppressed under the *Jarnagin* test, because it derived from and was the product of the *Miranda* violation on July 7. *Id.* at 717-19. Finally, statements that the defendant made later on July 8 after receiving *Miranda* warnings were not suppressed, because the belated *Miranda* warnings were effective under the *Vondehn* test. *Id.* at 716 n 8, 719-25.

[2] It is also worth noting that the *Vondehn* test applies only to statements made after belated *Miranda* warnings. Physical evidence remains subject to the *Jarnagin* test. *See, e.g.*, *Mast*, 301 Or App at 816, 820 (applying the *Vondehn* test to determine whether statements made after belated *Miranda* warnings should be suppressed, but applying the *Jarnagin* test to determine whether physical evidence obtained after belated *Miranda* warnings should be suppressed).

of the poisonous tree), whereas the suppression of the post-*Miranda* statements is a *Vondehn* issue (whether the belated *Miranda* warnings were effective such that the post-*Miranda* statements resulted from a knowing and voluntary waiver of rights). However, in his written and oral arguments to the trial court, defendant framed both issues in terms of derivation and fruit of the poisonous tree. The trial court then issued a written ruling on the motion to suppress in which, as to the post-*Miranda* statements, the court correctly identified the legal issue as being whether the belated *Miranda* warnings effectively and accurately informed defendant of his Article I, section 12, rights—but then, citing *State v. Alapai*, 308 Or App 309, 480 P3d 968 (2020), applied the *Jarnagin* factors rather than the *Vondehn* factors in conducting its analysis.[3]

On appeal, defendant has reframed his suppression argument regarding his post-*Miranda* statements to align with the correct legal standard as articulated by the trial court, that is, the effectiveness of the belated *Miranda* warnings. He also now relies on the *Vondehn* factors and makes his arguments based on those factors, without ever addressing the fact that the trial court relied on the *Jarnagin* factors. In response, the state cites the same legal standard, but it uses the *Jarnagin* factors to make its arguments, summarily citing *Alapai* as authority for that approach.

We agree with defendant that the relevant factors to consider in deciding whether his post-*Miranda* statements should have been suppressed are those identified in *Vondehn*. At the same time, we cannot fault the trial court for using the *Jarnagin* factors, given that it was relying on our decision in *Alapai*, wherein we inadvertently commingled the *Vondehn* and *Jarnagin* tests and considered the *Jarnagin* factors in assessing whether belated *Miranda* warnings were effective. *See Alapai*, 308 Or App at 315 ("We evaluate whether the belated warnings were effective—or, in contrast, whether the subsequent warned statements

---

[3] The trial court did not actually list out the *Jarnagin* factors in its opinion on the motion to suppress, but it cited *Alapai*, which uses the *Jarnagin* factors, and its findings tracked the *Jarnagin* factors. For example, its first finding pertained to whether the *Miranda* violation was flagrant. *See Jarnagin*, 351 Or at 716-17 (listing "the nature of the violation," which includes its flagrancy, first in a list of factors relevant to whether evidence derives from an earlier *Miranda* violation).

were 'the product of an earlier *Miranda* violation'—by considering 'all relevant circumstances,' which include [the five *Jarnagin* factors]." (Quoting *Jarnagin*, 351 Or at 716.)). We take this opportunity to clarify that it is the *Vondehn* test and *Vondehn* factors that apply to determine whether statements made after belated *Miranda* warnings should be suppressed, and we disavow any contrary language in *Alapai*.

Given our conclusion that it is the *Vondehn* factors that apply, we have considered whether a remand is necessary for the trial court to apply those factors instead of the *Jarnagin* factors and have decided that it is not. That is because the trial court ultimately analyzed the correct issue, which was the effectiveness of the belated *Miranda* warnings under the totality of the circumstances, *Vondehn*, 348 Or at 467; our review is for legal error, *Beeson,* 307 Or App at 810; and applying the *Vondehn* factors instead of the *Jarnagin* factors does not require us to engage in any factfinding, due to there being no material disputes of fact. It also bears noting that defendant has invited us to apply the *Vondehn* factors by arguing them in his opening brief, despite the trial court having used the *Jarnagin* factors, and he has not suggested that there is any impediment to our doing so. For those reasons, we proceed to review the trial court's denial of defendant's motion to suppress his post-*Miranda* statements but, in doing so, consider the *Vondehn* factors instead of the *Jarnagin* factors.

The issue before us, as previously described, is "whether the belated *Miranda* warnings were effective in ensuring that the defendant's decision to waive his right against self-incrimination was knowing and voluntary." *Delong,* 357 Or at 373. A court must consider "all relevant circumstances" in making that determination, including,

> "(1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second rounds of interrogation, (4) the continuity of police personnel, (5) the degree to which the interrogator's questions treated the second round as continuous with the first, and (6) whether the police cautioned that the earlier unwarned statement could not be used in any subsequent prosecution."

*Vondehn*, 348 Or at 479. The court's "focus is not on the subjective intent of the police but on the objective message that the police actually convey by the techniques that they use and the warnings that they give." *Id.* at 483.

Here, some of the *Vondehn* factors weigh in favor of suppression, as the trial court acknowledged. The post-*Miranda* round of questioning took place immediately after the pre-*Miranda* round of questioning, in the same location on the side of the road, with the same officer doing the questioning. There was also some overlapping content between the two statements, and no one advised defendant that the first statement could not be used. *See Mast*, 301 Or App at 819 (substantive similarity of pre- and post-*Miranda* statements weighed in favor of suppression); *State v. Edgar*, 297 Or App 193, 204-05, 441 P3d 234 (2019) (continued questioning by the same deputies, without a break in time, and without an explanation that the prior statement could not be used, favored suppression); *but see also Vondehn,* 348 Or App at 486 (telling a suspect that his unwarned statements may not be admissible will often militate in favor of concluding that the warnings were effective, but failing to do so is not determinative).

Other *Vondehn* factors weigh in favor of the *Miranda* warnings being effective. The sheriff treated the second round of questioning as independent of the first, including asking defendant to start again from the beginning (albeit not immediately). Defendant's second set of statements was also much more detailed and extensive than the first. The first round lasted 80 seconds, during which defendant conveyed only the most basic facts of his version of events, whereas the second round lasted 18 minutes, during which defendant detailed virtually every aspect of the incident as well as providing information about the parties' relationship and the like. *See Vondehn,* 348 Or App at 485 (finding a "marked difference" where "[t]he unwarned questions were routine in nature and consumed less than a minute of time" and the warned questions were "significantly more detailed and probing"). It is also relevant that, although the initial stop was highly confrontational, once defendant was handcuffed and confirmed to be unarmed, the actual questioning

was conducted in a polite and nonconfrontational tone, and no coercive questioning techniques were used. *See id.* at 486 (that the defendant was "not subjected to additional coercion" after his initial arrest and handcuffing, and the conversational tone in which he was questioned, weighed in favor of the belated *Miranda* warnings being effective). Defendant's words and demeanor suggested eagerness to give his version of events. When defendant launched back into talking after hearing his rights, the sheriff stopped him to expressly ask whether he still wanted to talk to them "with [his] rights in mind," and defendant unequivocally said that he did and had nothing to hide.

Considering the totality of the circumstances, we agree with the trial court that, when the sheriff belatedly administered *Miranda* warnings, he effectively and accurately informed defendant of his Article I, section 12, rights, and that defendant knowingly and voluntarily waived his rights at that point. The trial court did not err in denying suppression of defendant's post-*Miranda* statements.

## MOTION FOR MISTRIAL

Defendant next challenges the denial of his motion for a mistrial.

At trial, one of the state's witnesses was P. P described the incident at the campsite on direct examination, including how she used a crowbar on the trailer door at one point. On cross-examination, P was asked whether she was trying to get into the trailer to find out whether anything sexual was happening. P answered yes. P then spontaneously stated, "He was accused of raping this girl over a year ago." Defendant immediately moved for a mistrial. Outside the presence of the jury, the trial court recognized that, although it was neither party's fault, in that P's statement came out of nowhere, P had just created a "significant situation," that it was "a hell of an accusation to lay against somebody in front of a jury," and that it was a "very problematic thing to have happen during trial." Before hearing argument on the motion, the court asked defense counsel if she wanted to confer with her client, given that a mistrial would mean another trial for him, and she agreed that she

should. Both attorneys noted that P had never said anything like that before, to the police, to the prosecutor, or to anyone to their knowledge.

When they came back on the record, defense counsel stated that if the court would allow her to call L to testify out of order (after the state's next witness), and if the state stipulated that there were no charges pending against defendant for any kind of sexual offenses, as the prosecutor was willing to do, then they "could roll forward with this jury." Otherwise, "we would stand by a motion for mistrial, although [defendant] is really struggling with his decision." The court stated that it would allow defendant to call L to testify—something about which it has been "on the fence" until that point[4]—but that it did not want her called out of order, which meant that L would likely testify the next day. Defense counsel stated, "Then we stand by our motion for mistrial." The court heard from the state, which argued against a mistrial, and asked defense counsel some questions. The court noted how far along the trial was, defendant's congestive heart failure, and the fact that P had clearly never said anything about a rape allegation to law enforcement during the campsite incident investigation. The state again offered to stipulate to the state having no record of any rape allegation against defendant.

Having considered the parties' arguments, the trial court denied the motion for mistrial but took curative steps to address the situation. The court (1) ordered that P not make any mention of the matter again, unless asked a specific question on cross-examination, and it directly questioned P to ensure that she understood; (2) ordered that the state immediately call its office manager to testify that no such allegation had ever been referred to law enforcement, and rejected the state's preference for a stipulation instead of live testimony; and (3) ruled that defendant would be allowed to call L as a witness the next day during the defense case. No curative instructions were discussed at that time, but the court later invited defense counsel to let

_____

[4] It appears that defendant had requested earlier in the day to add L as a late witness, the state objected, and the trial court deferred ruling. It also appears that defense counsel was having trouble securing L's attendance and was concerned that she might not be able to get L on the stand.

the court know if defendant wanted a curative instruction in addition to the curative steps ordered by the court.

When the jury returned, there was only about an hour left before the evening recess. The state immediately called the office manager for the Harney County District Attorney's Office as a witness. She testified that she was on duty that day, that she had reviewed the case reporting system in connection with defendant's trial and "a potential statement regarding a rape allegation involving [defendant and L]," and that she did not find anything referred by any agency regarding any such allegation. The state then called P to finish her testimony. The state's case continued into the next day, with the state calling its remaining witnesses then resting. Defendant called three witnesses, including himself. L failed to appear and did not testify.

All of the charges went to the jury, except the harassment counts, which were dismissed at the state's request. The jury acquitted defendant of UUW. It found him guilty on the pointing-a-firearm and reckless-endangering charges, but the latter verdicts merged with the former, such that defendant was ultimately convicted of two counts of pointing a firearm at another.

On appeal, defendant contends that it was error not to grant a mistrial. He argues that P's statement was "patently false and highly prejudicial," that the trial court's curative steps "were wholly inadequate to 'unring the bell,'" and that he "could not have possibly received a fair trial" after P made that statement. Defendant compares this case to *State v. Jones*, 279 Or 55, 62-63, 566 P2d 867 (1977), in which the defendant was on trial for rape, and the prosecutor made several statements falsely insinuating that he had prior rape convictions, and *State v. Jenkins*, 63 Or App 858, 860-61, 666 P2d 869 (1983), in which the defendant was on trial for sexual abuse, and the prosecutor cross-examined the defendant regarding inadmissible prior rape and assault convictions.

The state responds that P's statement was "not so incurably prejudicial as to deny defendant a fair trial" and that the trial court took appropriate curative measures to

address it. The state notes that the jury heard testimony from defendant's two adult daughters regarding P being mean to defendant, trying to hurt him or cause trouble for him when she is angry, saying false things to hurt him, and being a dishonest person. The state further notes that the jury acquitted defendant of the most serious charge, UUW, which was the only felony charge.

Having reviewed the record and considered the parties' arguments, we agree with the state that the trial court did not abuse its discretion by denying a mistrial. When a party moves for a mistrial, the trial court must decide whether to grant the motion, deny the motion but take curative steps, or deny the motion without taking any curative steps. *State v. Evans*, 211 Or App 162, 166, 154 P3d 166 (2007), *aff'd*, 344 Or 358, 182 P3d 175 (2008). We review that decision for abuse of discretion. *Id.* Because a mistrial is "a drastic remedy to be avoided," and the "trial court is in the best position to assess the effect of the complained-of incident and to determine the means necessary to correct it," we will reverse only if the defendant was denied a fair trial. *State v. Harris*, 303 Or App 464, 466-67, 461 P3d 1080, *rev dismissed*, 367 Or 291 (2020) (internal citations omitted). For a trial to be fair, the verdict must be based on the evidence, not external factors. *State v. Hunt*, 297 Or App 597, 600, 442 P3d 232 (2019).

Here, P spontaneously asserted that defendant "was accused of raping this girl over a year ago." In responding to defendant's immediate motion for a mistrial, the trial court recognized the seriousness of the situation—as do we—and heard argument at some length before finally deciding how to proceed. The court ultimately decided that a mistrial was not necessary, but it took a number of curative steps. First, the court required the state to immediately call the district attorney's office manager to testify that the state had no record of any such accusation being made against defendant. Such testimony did not foreclose the possibility of an unreported rape accusation, but it did significantly blunt the force of P's testimony, particularly given the speed with which the office manager was called and the fact that she was called as a witness for the state. Second, the court ensured that P would not say anything further on the matter,

unless asked by defense counsel, and she did not. Third, the court granted a pending motion to allow L to testify, and the fact that L failed to appear cannot be attributed to the court. Finally, the court expressed willingness to consider a curative instruction, if defendant wanted one, although it ultimately did not give one in the absence of a request.

There is no question that P's statement was highly inflammatory. However, defendant was not on trial for any kind of sexual offense, which is very significant to our analysis, in that the court would have needed to do more to ensure a fair trial if defendant had been charged with a sexual offense. Instead, defendant was charged with crimes of an entirely different nature, basically firearms offenses. In that context, the trial court did not declare a mistrial, but it required the state to immediately call the office manager to make clear that the state had no record of any rape accusation ever being made against defendant. And the state did not make any use of P's statement; to the contrary, it was as surprised as defendant by it being made, supported the court taking curative steps, and never mentioned or alluded to it in any way.[5] *See State v. Pratt*, 316 Or 561, 583, 853 P2d 827, *cert den*, 510 US 969 (1993) (affirming the denial of a mistrial, in part because the witness's improper prejudicial statement was "isolated and made in passing" and the state did not capitalize on it in any way).

Although defendant now argues that the trial court's curative steps "were wholly inadequate to 'unring the bell'" and that defendant could not possibly receive a fair trial after P's testimony, defendant did not take nearly so stark a position in the trial court. To the contrary, defendant was "really struggling with his decision" about whether to seek a new trial, and his counsel was willing to withdraw the mistrial motion—evincing her belief that defendant could receive a fair trial with appropriate curative steps—if the court let defendant call L to testify out of order and if the state stipulated that there were "no charges pending" against defendant for any kind of sexual offense. The trial court did not take the precise curative steps that defendant

---

[5] We note that the trial court did not *strike* the offending statement. In the trial court, neither party suggested striking it, and, on appeal, neither party mentions that issue.

wanted, but it took substantially similar curative steps. It did more on the second point—requiring the district attorney's office manager to testify in person, immediately, which she did, testifying not only that there were no charges pending but that there was no record of any referral from any agency related to such an accusation. And it did slightly less on the first point—ruling that L would be allowed to testify but that defendant would need to call her the next day during his own case, rather than calling her out of order during the state's case.

In the end, we are unpersuaded that P's spontaneous assertion that some unspecified person had accused defendant of "raping this girl over a year ago" was so prejudicial in a trial on firearm offenses against P and K that the court had no choice but to declare a mistrial. "A motion for mistrial is addressed to the sound discretion of the trial judge, who is in the best position to assess and to rectify the potential prejudice to the defendant." *State v. Farrar*, 309 Or 132, 164, 786 P2d 161, *cert den*, 498 US 879 (1990) (internal quotation marks omitted). The trial court recognized the seriousness of the situation and took steps to remedy it, short of declaring a mistrial, and to ensure defendant a fair trial. On this particular record, we conclude that the court's approach was within the range of legally permissible options. *See State v. Johnson*, 199 Or App 305, 311-12, 111 P3d 784, *rev den*, 339 Or 701 (2005) ("[A] trial court abuses its discretion when it selects a means that is not within the range of legally acceptable options."). The trial court did not abuse its discretion by denying the motion for mistrial.

Affirmed.